# COMMISSIONER OF INTERNAL REVENUE v. SHAMBERG'S ESTATE.

## No. 394.

Circuit Court of Appeals, Second Circuit.

Aug. 24, 1944.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, J. Louis Monarch, and Bernard Chertcoff, Sp. Assts. to Atty. Gen., for petitioner, Commissioner of Internal Revenue.

George Wharton Pepper, of Philadelphia, Pa. (George Wharton Pepper, of Philadelphia, Pa., Julius Henry Cohen, of New York City, John D. M. Hamilton, of Philadelphia, Pa., and Leander I. Shelley, Austin J. Tobin, and Daniel B. Goldberg, all of New York City, of counsel), for respondent, Estate of Alexander J. Shamberg, deceased, and Isidor W. Shamberg, as Administrator, and for Port of New York Authority, amicus curiae.

Before AUGUSTUS N. HAND, CHASE, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This proceeding involves deficiencies in income taxes assessed against Alexander J. Shamberg by the Commissioner of Internal Revenue for the years 1937 and 1938. Shamberg died during the pendency of a proceeding in the Tax Court to review the assessment and his administrator was substituted as a party. The Tax Court determined that there were no deficiencies and the Commissioner filed this petition to review its decision which a majority of this court holds should be affirmed.

The question presented is whether the interest received by Shamberg in the years 1937 and 1938 on bonds of the Port of New York Authority (hereinafter called the "Authority") known as Interstate Bridge and Tunnel Bonds—Series E, and General and Refunding Bonds—First Series, is subject to income taxes.

According to the view we take, the income from the above bonds, issued in 1931 and 1935 respectively, was exempt from taxation under the provisions of Section 22 (b) (4) (A) of the Revenue Act of 1936 and the corresponding section, identical in form, of the Revenue Act of 1938, 26 U.S.C.A.Int.Rev.Acts, pages 825 and 1008. These statutory provisions and the Treasury Regulations interpreting them are as follows:

"Sec. 22. Gross Income

"(a) General Definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

"(b) Exclusions from Gross Income. The following items shall not be included in gross income and shall be exempt from taxation under this title:

* * * * * *

"(4) Tax-free interest. Interest upon (A) the obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia."

Treasury Regulations 94, promulgated under the Revenue Act of 1936:

"Art. 22(b) (4)-1. Interest upon State obligations.—Interest upon the obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia is exempt from the income tax. Obligations issued by or on behalf of the State or Territory or a duly organized political subdivision acting by constituted authorities empowered to issue such obligations, are the obligations of a State or Territory or a political subdivision thereof. Special tax bills issued for special benefits to property, if such tax bills are legally collectible only from owners of the property benefited, are not the obligations of a State, Territory, or political subdivision. The term 'political subdivision,' within the meaning of the exemption, denotes any division of the State or territory which is a municipal corpora-

tion, or to which has been delegated the right to exercise part of the sovereign power of the State or Territory. As thus defined, a political subdivision of a State or Territory may, for the purpose of exemption, include special assessment districts so created, such as road, water, sewer, gas, light, reclamation, drainage, irrigation, levee, school, harbor, port improvement, and similar districts and divisions of a State or Territory."

The provisions of the foregoing Article of Regulations 94 were amended in Treasury Regulations 101, promulgated under the Revenue Act of 1938 so that the words "or may not" follow the word "may" in the last sentence.

The applicability of the statutory exemption from income taxes which we have referred to depends upon the nature and activities of the Authority which are set forth in a stipulation by the parties.

The Authority is a body politic and corporate created by a compact made between the States of New York, Laws N.Y.1921, c. 154, and New Jersey on April 30, 1921, N.J.S.A. 32:1–1 et seq., and approved by Congress on August 23, 1921, 42 Stat. 174. It is fully owned by the two states and its projects are all operated in the interest of the public without profit to private persons. The compact was induced by the necessity for joint state action in the development of the Port of New York which lies partly within the jurisdiction of each state. It created a district to be known as the "Port of New York District" comprised of areas in both states and the waters between them, in which were included about 200 separate municipalities and a population of over 10,000,000.

Article VI of the compact vested the Authority with " * * * power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within said district; and to make charges for the use thereof; and for any of such purposes to own, hold, lease and/or operate real or personal property, to borrow money and secure the same by bonds or by mortgages upon any property held or to be held by it * * *" except that property held by either state or by any of their municipalities should not be taken without the consent of the state or municipality affected. The Authority was to make plans for the development of the district. It was empowered to make recommendations to the states, to intervene in proceedings affecting the commerce of the port and to petition such bodies as the Interstate Commerce Commission as to matters within its jurisdiction.

Article XVIII authorized the Authority, subject to the exercise of the power of Congress, to make rules and regulations relating to navigation and commerce, which rules, however, were to be effective only when concurred in by the legislatures of both states. The states agreed by Article XIX to provide penalties and means of enforcement of the orders and regulations of the Authority. The Authority has made regulations with respect to its bridges and tunnels which have been concurred in by the legislatures of the states, penalties for their violation having been provided by state law and the inferior criminal courts of the states having been given jurisdiction to enforce these penalties.

The powers of the Authority are vested in a board of twelve Commissioners—six from each state, who take an oath of office and may be removed only upon charges and after a hearing. Their actions are binding only after approval by a majority of the Commissioners from each state and the Governor of each state has a veto power over the acts of the Commissioners from his state.

The plan adopted by the two states, N.J.S.A. 32:1–25 et seq., Laws N.Y.1922, c. 43 and consented to by Congress in 1922, Joint Resolution July 1, 1922, 42 Stat. 822, sets forth the principles upon which the development of the Port should proceed, and provides that (Section 8):

"The Port of New York Authority is hereby authorized and directed to proceed with the development of the port of New York in accordance with said comprehensive plan as rapidly as may be economically practicable and is hereby vested with all necessary and appropriate powers not inconsistent with the constitution of the United States or of either state, to effectuate the same, except the power to levy taxes or assessments. * * * The port authority shall be regarded as the municipal corporate instrumentality of the two states for the purpose of developing the port and effectuating the pledge of the states in the said compact, but it shall have no power to pledge the credit of either state or to impose any obligation upon either state, or upon any municipality, except as and when such power is expressly granted by statute, or the consent by any such

municipality is given." N.J.S.A. 32:1–33; Laws 1922, c. 43, § 8.

Up to the present time the Authority has not applied for any grant of power to pledge the credit of either of the states and has never applied to any municipality for the power to impose any obligation upon it. The Authority is not subject to the debt limiting provisions of the constitution of the two states; it was created in order to establish an agency with operating power independent of state and municipal debt limitations.

The Authority has constructed various vehicular crossings. They have been the Arthur Kill Bridges, the George Washington Bridge, the Bayonne Bridge, the Holland Tunnel and the Lincoln Tunnel.

*Arthur Kill Bridges.*

The two states authorized the Authority to build, operate and maintain these two bridges with the necessary approaches across the Arthur Kill, the first between Perth Amboy, New Jersey, and Tottenville, New York, and the second between Elizabeth, New Jersey, and Howland Hook, New York. Each state appropriated $100,000 for preliminary work, but provided that these sums should be returned to the states after the bridges had been fully paid for and the debts incurred therefor amortized out of revenue. The cost of these bridges exceeded $17,000,000, which was financed by the sale of bonds of the Authority to the extent of $14,000,000 and $4,000,000 advanced in equal portions by the two states under an agreement that the state advances should be repaid when the cost of construction of the bridges was paid for and all other debts were amortized. The War Department approved the construction of these bridges in 1925 and they were opened to traffic on June 29, 1928. N.J.S.A. 32:1–36 et seq.; Laws N.Y.1924, cc. 186, 230.

*George Washington Bridge.*

In 1925 the Authority was authorized by the two states to construct, operate, maintain and own a bridge across the Hudson between Manhattan and Fort Lee, each state appropriating $150,000 for preliminary studies and providing for the repayment as in the case of the Arthur Kill bridges. Construction of this bridge was approved by the War Department in 1926 and it was opened to traffic on October 25, 1931. The Authority also constructed the system of approaches to both termini of the bridge. The termini are maintained by the City of

New York and the State of New Jersey respectively and are open to local traffic as well as to bridge traffic without charge. The cost of the bridge was financed by the sale of bonds of the Authority in the amount of $50,000,000, a grant by the Public Works Administration of the Federal Works Agency in amount of $1,490,455, and advances by the two states of $9,800,000, provisions being made, as in the case of the Arthur Kill Bridges, for the repayment of the advances by the states. N.J.S.A. 32:1–71 et seq.; Laws N.Y.1925, c. 211.

*Bayonne Bridge.*

The states also authorized the Authority to construct, maintain, operate and own a bridge across the Kill van Kull between Bayonne, New Jersey and Staten Island, each state appropriating $50,000 for preliminary studies with provision for repayment of these advances. Construction was approved by the War Department in 1927 and the bridge was completed in 1931 at a cost of over $13,000,000, which was financed by the sale of bonds of the Authority to the extent of $12,000,000 and by advances by the two states in the amount of $4,100,000 with provision for repayment of the advances as in the case of the other bridges.

Congress granted its consent to the construction of the four bridges above mentioned. N.J.S.A. 32:1–94 et seq.; Laws N.Y.1926, c. 279.

*Holland Tunnel.*

The Holland Tunnel was constructed by the two states and operated by them until 1930 through Commissions. In that year by concurrent legislation the two states provided that the Holland Tunnel should be conducted and continued as part of the operations of the Authority which are thereby vested with its control, operation and maintenance, the states, however, retaining title. The revenues were to be held by the Authority as agent of the states. The statutes provided that all obligations made or assumed by the Authority in connection with the tunnel should be assumed in its own name and should create no liability of the two states, or either of them. The Authority was authorized to raise funds through the sale of its own bonds, pursuant to which authorization Interstate Bridge and Tunnel Bonds—Series E (one of the two bonds issued involved in this case) were issued in amount of $50,000,000. The proceeds from the sale of these bonds were to repay the states for

outlays in connection with the tunnel. The bonds were secured by the tolls from the tunnel. P.L.N.J.1930, c. 247; N.J.S.A. 32:2–27; Laws N.Y.1930, c. 421.

*Lincoln Tunnel.*

By legislation adopted in 1930 the two states authorized the Authority to report as to an additional tunnel under the Hudson and each state appropriated $200,000 for this purpose. Repayment of these appropriations was not required. The southerly tube of this tunnel was open to traffic in December 1937, and the northerly tube was intended to be completed and opened to traffic in 1943. A system of approaches to the tunnel in New York were built at a cost of $9,174,000, and in New Jersey at a cost of $20,034,000. The cost of the Lincoln Tunnel through December 31, 1941, exceeded $72,750,000. The initial cost of constructing the first unit of the tunnel was financed by a loan to the Authority of $12,-300,000 made by the United States through the Federal Emergency Administration of Public Works. The loan agreement of September 1, 1933 contained the provision inserted at the request of the United States that the officers of the Administration of Public Works should be furnished with opinions both of bond counsel, satisfactory to the government, and of Port Authority's general counsel, to the effect that the notes to be issued to the government were exempt under the Constitution of the United States from all taxation (except inheritance, estate and gift taxes) then or hereafter imposed by the United States or the States of New York and New Jersey. Such opinions were furnished. In 1935 the Authority sold its General and Refunding Bonds First Series (which is the second of the two bond issues involved herein) in amount of $16,500,000 from the proceeds of which it repaid the loan from the United States. The balance of the cost of the Lincoln Tunnel has been financed by the sale of various issues of General and Refunding Bonds, from accumulated Authority earnings held in its general reserve fund and from a grant of the United States of $5,391,573.50.

Tolls are charged for the use by vehicles of the bridges and tunnels described above. P.L.N.J.1930, c. 248, N.J.S.A. 32:2–27; Laws N.Y.1930, c. 420.

*Other activities.*

*Inland Terminal Building.*

The Authority constructed an Inland Terminal Building between 15th and 16th Streets and 8th and 9th Avenues in the Borough of Manhattan, at a cost of $16,-000,000 which is used as an office for the Authority and a terminal station for various trunk line railroads and also (because it would not otherwise be self-supporting) to rent out for manufacturing and commercial uses.

Since 1931, the Authority has operated a bus service over one of the Arthur Kill bridges.

The two states have adopted legislation regulating the use by the Authority of its revenues which have been expended as so directed solely for the operating and administration expenses of the Authority and for interest upon and retirement of outstanding debts.

In the compact pursuant to which the Authority was created the states agreed to make annual appropriations (not in excess of $100,000 for each state) for expenses of the Authority until Revenues from its operations were sufficient to meet its expenses. These annual appropriations were discontinued in 1934 because the revenues from the bridges, the Holland Tunnel and Inland Terminal had become sufficient.

The states have vested in the Authority the power to make and enforce such rules and regulations as it may deem convenient or necessary for the operation and maintenance of the various bridges and tunnels within its jurisdiction. Penalties were provided for their violation, and the inferior criminal courts of the states were given jurisdiction to enforce such penalties.

The State of New York has enacted legislation giving the Authority jurisdiction over all New York residents, corporations and property owners for the purpose of its investigations or hearings in connection with its planning for port improvement, and also for the purpose of all such other action or powers as it may be empowered to exercise. Such legislation further provided that it should have the power to subpoena such persons or corporations, failure to reply being punished in contempt proceedings upon its application to the Supreme Court of New York.

The State of New York has further enacted that the Authority have power to issue orders after hearings requiring obedience of persons subjected to the jurisdiction of the Authority by the statute. The statute further provided that the Authority should have power to enforce its orders by commencing mandamus, injunction, or

other appropriate proceedings in the Supreme Court of the state against violators.

In the operation of its bridges and tunnels the Authority maintains a uniformed police force, the members of which are designated by statute as regular police and peace officers of both states. The property of the Authority and the bonds and other securities issued by it are exempt from state taxation in both states. It has the power of condemnation, its employees may join the New York State Retirement System and the Authority has been held to be immune from suit. No tax or assessment is levied within the Port District by or on behalf of the Authority.

The decedent Shamberg, if alive, would have testified at the hearing that he acquired his bonds upon legal advice that the income was immune from federal income tax under the Constitution and that it was further exempt from such taxes under existing statutes and regulations.

The final summary appearing in the stipulation shows that the Authority's facilities have been financed through issues of its own bonds and notes to the extent of $205,551,582.82, and that appropriations by the states amounted to $2,856,663.11, federal grants to $6,450,893.65, and advances by the states to $18,650,000. The Authority's revenues have been derived principally from the operation of its facilities and properties, and of these the main sources are the vehicular crossings.

The Commissioner first argues that the interest on the bonds of the Authority is taxable under the ruling in Helvering v. Gerhardt, 304 U.S. 405, 58 S.Ct. 969, 977, 82 L.Ed. 1427. It is really enough to answer this argument to say that Justice Stone, who wrote the opinion of the majority of the Supreme Court, said in the very last paragraph: "Expressing no opinion whether a federal tax may be imposed upon the Port Authority itself with respect to its receipt of income or its other activities, we decide only that the present tax neither precludes nor threatens unreasonably to obstruct any function essential to the continued existence of the state government." The majority of the Tax Court was, therefore, clearly right in concluding that when Justice Stone said, 304 U.S. at page 423, 58 S.Ct. at page 977, 82 L.Ed. 1427: "* * * we think it plain that employees of the Port Authority are not employees of the state or a political subdivision of it within the meaning of the regu-

lation as originally promulgated * * *," he was referring to the regulation which exempted from income tax the compensation of "state officers and employees" for "services rendered in connection with the exercise of an essential governmental function of the State," and in effect saying no more than that the Authority was not exercising "an essential governmental function." We cannot see that the decision in Helvering v. Gerhardt has any bearing upon the issues before us.

 It is next argued by the Commissioner that in enacting Sec. 22 (b) (4) (A) exempting "interest upon * * * the obligations of * * * a State * * * or any political subdivision thereof * * *," Congress was only excluding from income tax such interest as could not under constitutional doctrines prevailing in 1913, when the exemption act was originally passed, be lawfully taxed. In support of this the Commissioner quotes the statement of Honorable Cordell Hull, who sponsored the measure in the House, in which he said the exemption was inserted "not desiring to raise any Constitutional question or to arouse the antagonism of any of the states." This quotation is relied upon as indicating that Congress intended to limit the scope of the exemption to income thought at the time to be beyond the taxing power. It is argued in this connection that no such institutions as the Port Authority were then in contemplation of Congress, since the Port Authority (established in 1921) was the first of such bodies to exist. Doubtless it is true that Congress had no such specific form of state organization in mind, but that adds nothing to the solution of the problem. The only question is whether Congress would have intended the exemption to apply if these new forms of state activity had existed; in other words, what, in view of the general setting, is the reasonable interpretation of the words used. That there was no intention strictly to limit the exemption to what was thought to be beyond the taxing power is shown by the statement of Mr. Hull that it was the purpose of the enactment not only to avoid raising "any constitutional questions" but also to avoid arousing "the antagonism of any of the states." We think this statement involved a much broader purpose than to crystallize the constitutional doctrine of that particular time in the statute. Indeed, the existence of any such purpose is negatived by the fact that the limitations of constitutional power

were by no means certain or thought to be certain at the time the act was passed. It seems to us entirely unreal to limit what we believe was the broad purpose to exempt the bonds of states and their agencies when engaged in customary governmental activity, particularly when one of the main purposes of the exemption provision was to facilitate the passage of the Sixteenth Amendment.

■ The views we have expressed seem quite in accord with the opinion given by Attorney General McReynolds to the Secretary of the Treasury on January 30, 1914, following the adoption of the 1913 exemption, 30 Op.Atty.Gen. (1914) p. 252, in which the question was raised as to whether certain special districts are "political subdivisions" of the state within the meaning of the proviso. The Attorney General said:

"The term 'political subdivision' is broad and comprehensive and denotes any division of the State made by the proper authorities thereof, acting within their constitutional powers, for the purpose of carrying out a portion of those functions of the State which by long usage and the inherent necessities of government have always been regarded as public. The words 'political' and 'public' are synonymous in this connection. (Dillon Municipal Corporations, 5th ed., sec. 34.) It is not necessary that such legally constituted 'division' should exercise all the functions of the State of this character. It is sufficient if it be authorized to exercise a portion of them. * * *

"The purposes to which you refer, namely, the improvement of streets and public highways, the provision of sewerage, gas, and lights, the reclamation, drainage, and irrigation of considerable districts of land, are clearly public and have always been so treated."

It is contended that the foregoing opinion is not pertinent to the case at bar because it was directed to the taxability of interest on bonds of assessment districts which possessed the power of taxation, which was said to be "perhaps the most important power possessed by the State." But the real criterion adopted by the Attorney General seems to have been whether the activities of the subdivision were for a public purpose. In this connection he remarked: "A tax can only be laid for a public purpose * * *, and therefore, where the power to levy a tax is given a district by the State, presumptively that district is created for a

public use and is exercising a public function"; and he closed by saying: "I desire carefully to refrain from expressing any opinion whether assessment districts might not be created for a purely private purpose so as to bring them within the principles laid down in the South Carolina Dispensary case [State of South Carolina v. United States] 199 U.S. 437 [26 S.Ct. 110, 50 L. Ed. 261, 4 Ann.Cas. 737], rather than within those which governed United States v. Railroad Company, 17 Wall. 322 [21 L.Ed. 597]." Later, in 1937, Secretary Morgenthau asked for an opinion of the Attorney General as to whether an irrigation district in the State of California was a "political subdivision" of the state within the meaning of an exemption provision contained in the Revenue Act of 1932, as amended by the Revenue Act of 1935, 26 U.S.C.A.Int.Rev.Code § 3442, relieving persons who sold articles "for the exclusive use of the United States, any State, * * * or any political subdivision of the foregoing * * *," from excise taxes. He also requested a reconsideration of the opinion of Attorney General McReynolds of January 30, 1914. Attorney General Cummings advised the Secretary in favor of the exemption (38 Op.Atty.Gen. 563) saying that the question apparently turned "upon whether the irrigation district is a 'political subdivision' of the state within the meaning of Section 620(3), Title IV, of the Revenue Act of 1932, as amended." He adverted to the fact that the Treasury Department had followed the opinion of Attorney General McReynolds in the administration of the income tax law since 1914, and said:

"The term 'political subdivision' may be used in statutes in more than one sense. It may designate a true governmental subdivision such as a county, township, etc., or, as held in the Attorney General's opinion under consideration, it may have a broader meaning, denoting any subdivision of the state created for a public purpose although authorized to exercise a portion of the sovereign power of the state only to a limited degree." He concluded as follows: "To attribute at this time to the term 'political subdivision', as used in the Revenue Act of 1913 and in Section 620(3), a meaning different from that stated in the former opinion of the Attorney General would disturb the above-mentioned practice in the administration of the income tax law followed for over twenty-two years. The reasonable

view is that the Congress, which must be presumed to have had knowledge of this administrative practice under the former act, intended that the term as used in Section 620(3) should receive a similar construction.

"I do not feel, therefore, that the Attorney General's former opinion should be disturbed upon the authority of the state decisions to which you refer, and I suggest that any change in policy should be made only in accordance with legislative direction or judicial decision."

The Commissioner also relies on State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737, as indicating that the exemption should not be applied to state activities which are not wholly essential to its sovereignty. The argument is based on the claim that the exemption provision must be interpreted in the light of that decision, which it is said governed the extent of the constitutional power to tax at the time when the exemption statute was enacted. We have already said that, in our opinion, the exemption provision was not limited to cases where federal taxation was constitutionally possible in 1913, but covered a broader field where taxation of obligations was doubtful and subject to contention by the states. But even assuming the government's interpretation of the exemption provision as merely enacting the constitutional doctrine as of 1913, we do not think that the South Carolina case would permit taxation of such a state agency as the Port Authority. That decision related only to the power of the government to impose the usual license taxes upon dispensaries established by the state for the wholesale and retail sale of liquor. It held that such a state agency was subject to the tax, and that the constitutional limitation did not extend to instrumentalities used by the state in carrying on an ordinary private business. This was plainly a commercial business which resulted in one year of a profit of about $500,000 which was divided between the state and local municipalities. Such a holding seems to us far from indicating that it was ever applicable to agencies having customary governmental activities, such as development of roads, bridges and waterways entered upon with no profit motive.

With respect to the analogy drawn by Brewer, J., in the opinion in the above case, to the liability of municipal corporations in tort when they are engaged in private as distinguished from public business, it was merely one of the arguments in support of the result which has since been abandoned as a criterion by the Supreme Court in Brush v. Commissioner, 300 U.S. 352, 362, 373, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428. Indeed, in Murray v. Wilson Distilling Co., 213 U.S. 151, 173, 29 S.Ct. 458, 53 L.Ed. 742, decided in 1909, the South Carolina decision was explained upon the ground that a state had no power by legislation in regard to the sale and consumption of liquor to destroy a preexisting right of taxation of the federal government. Any claim that the South Carolina decision governs the present case proves too much, for, if it be read as permitting taxation of almost every governmental activity, it would certainly fly in the face of the practice of the Treasury Department for the last forty years and the opinions of the two Attorney Generals acted upon by the treasury, since it has never been held, nor is it here contended, that income from such state agencies as irrigation and levee districts is not exempt, although neither of these activities, nor even the existence of the districts, is essential to the state. Here the activities, even though some of them might have been exercised by private corporations under appropriate legislation, are exercised for a public purpose by an agency set up by the states and given many public powers, though not of taxation or control through the suffrages of citizens. It minimizes its public and political character to treat such an agency as a private corporation merely because of the lack of taxing power which is only one of the attributes of sovereignty.

But the regulation we have quoted makes our position still clearer. It defines political subdivision as one "to which has been delegated the right to exercise part of the sovereign power of the State", and while it says it may for the purpose of exemption include "special assessment districts * * * such as road, water, sewer, gas, light, reclamation, drainage, irrigation, levee, school, harbor, port improvement, and similar districts and divisions of the State", it does not preclude political subdivisions which do not possess the power of taxation but generally exempts interest on: "Obligations issued by or on behalf of the State or Territory or a duly organized political subdivision acting by constituted authorities empowered to issue such obligations."

We think that this regulation covered bonds of such a public body as the Authority, and was within the scope of the statute. When it gave immunity to bonds issued "on behalf of" the state as well as those issued by the state itself, those words certainly meant something in addition to the words "issued by", and what can the added words refer to except bonds issued by a state agency to carry out a public purpose where the latter is not named as obligor on the bonds. We need not claim that this public purpose may be a commercial enterprise for mere profit, as distinguished from a public activity of the traditional sort in which the Authority is engaged. It has many times been held that bonds issued by municipalities are within the exemption of Sec. 22 (b) (4) (A) even though payment is to be made only out of special funds and the credit of the municipalities was not pledged. Bryant v. Commissioner, 9 Cir., 111 F.2d 9; Commissioner v. Carey-Reed Co., 6 Cir., 101 F. 2d 602, 121 A.L.R. 1272; Commissioner v. Pontarelli, 7 Cir., 97 F.2d 793. Cf. Brush v. Commissioner, 300 U.S. 352, 371–373, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428.

Repeated reenactment by Congress of the exemption clause in various revisions of the revenue laws gives further support to the regulation as defining the scope of the statute.

In addition to this, we are dealing with a class of public securities which have in the case of the bonds of the Port Authority and bonds of numerous other state agencies of like character for years been held exempt under rulings of the Bureau of Internal Revenue. Such rulings were made as to the bonds of the State Highway Commission of Kentucky, the Thousand Island Bridge Authority, the Buffalo and Fort Erie Public Bridge Authority, the Triborough Bridge Authority, the General State Authority of Pennsylvania, and many others, as well as the Port Authority itself. This should bar the Commissioner's claim. Helvering v. Griffiths, 318 U.S. 371, 402, 63 S.Ct. 636, 87 L.Ed. 843.

The argument that the exemption does not apply to the Authority because two states, rather than one, created the agency is far from persuasive, and we reject it on the grounds stated by the Tax Court in the majority opinion.

For the foregoing reasons we hold the income derived from the taxpayer's bonds tax-free because it was interest upon obligations of a political subdivision of a state within the meaning of Section 22 (b) (4) of the Revenue Acts of 1936 and 1938 and upon obligations issued "on behalf of" a state within the meaning of Article 22 (b) (4)-1 of the Treasury Regulations.

Order affirmed.

FRANK, Circuit Judge (dissenting).

1. To ascertain what the legislature meant is often a difficult judicial task, difficult usually not because (as legislature-baiters put it) the legislature carelessly chose its words but because it could not anticipate all the circumstances to which ingenious future litigants would seek to apply those words.[1] Our task involves a greater difficulty: We must try to ascertain, guided by precedents not always close to the case in hand, what the Supreme Court, when the statute comes before it, will think Congress intended. In a case like this, almost certain to be reviewed, it may seem that any elaborate efforts of an inferior court will be wasted. Yet perhaps we can aid the Supreme Court by clarifying the issues. As I do not agree with my colleagues, a detailed statement of my reasons may partly serve that purpose by highlighting aspects of the case at which the majority opinion merely glances.

I would not go to the stake to vindicate my position. The reasoning on which my colleagues base their decision does not lack plausibility. But I venture to dissent because plausible reasoning does not seem to me enough to support a decision that an admittedly ambiguous statute confers an exemption from taxation. For it is familiar doctrine [1a]—applied not long since by this court (per Judge A. N. Hand) to the very section of the Act now before us

---

[1] Too frequently lawyers blame the difficulties of statutory interpretation on the ineptitude of the legislature. For typical instances of such legislature-baiting, see Allen, Law In the Making (1927) 275, 276.

[1a] See, e.g., Chicago, B. & K. C. R. Co. v. Guffey, 120 U.S. 569, 575, 7 S.Ct.

693, 30 L.Ed. 732; Phenix Fire & Marine Insurance Co. v. Tennessee, 161 U.S. 174, 177, 16 S.Ct. 471, 40 L.Ed. 660; Willcuts v. Bunn, 282 U.S. 216, 51 S.Ct. 125, 75 L. Ed. 304, 71 A.L.R. 1260; cf. Oklahoma Tax Comm. v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612. Cf. cases, such as New Colonial Ice Co. v. Helvering,

for interpretation [2]—that a statute granting a tax exemption must be narrowly construed, must be confined to matters plainly and unmistakably within its terms. In such a case, the government gets the benefit of the doubts, as it should, because the exemption from tax of some persons inevitably increases the burdens of others.

That here such doubts exist, that the Commissioner, his lawyers and I are not unique in perceiving them, that the answer to the question posed in this case is perhaps not as simple as one would gather from a casual reading of the majority opinion, all this is suggested by the advertised qualms of those who have had extensive dealings in bonds of the New York Port Authority and similar bonds: The record shows that, in June 1939, a considerable time before the present proceedings against this taxpayer began, the investment bankers who then sold to the public an issue of $39,300,000 of California Toll Bridge Authority bonds, in their selling circulars warned prospective investors that the bankers had been advised by counsel that it was not clear that the interest on the bonds was exempt from federal income tax; and that similar warnings were published in the sales circulars put out (again before these proceedings began) in February 1940 by the bankers who sold to the public an issue of $50,000,000 of Triborough Bridge Authority bonds and in December 1940 by the bankers who publicly sold a $27,750,000 issue of Port of New York Authority bonds.[3]

2. We are not here concerned with the broad question of federal taxation of interest on general revenue bonds of a state, or a municipality, payable out of taxes; or of interest on bonds of a special assessment district payable out of special taxes levied by the district. The different and more limited question here arises from facts which may be summarized thus:

A corporation is engaged primarily in activities often undertaken by privately-owned public utility companies—the operation of toll bridges and tunnels. This utility corporation is state-owned: two states jointly organized it and contributed to it an amount equal to about 10% of the cost of its properties,[4] the bulk of the investment having come from money borrowed by the corporation through the issuance of the corporation's bonds. To prevent these corporate bonds from ever being included in the debts of the states and to ensure that the states' taxpayers can never be called upon for taxes to pay these bonds, the statutes and instruments pursuant to which the bonds are issued deliberately and explicitly provide that, neither as to principal nor interest, shall they be or become the obligations of either state; the corporation is expressly denied the "power to pledge the credit of either state or to impose any obligation upon either state or upon any municipality" except with the express consent of such state or municipality, and no such consent has ever been given. The corporation itself has no power to levy taxes, nor can bondholders compel any taxes to be levied to pay the bonds or interest thereon. But the corporation has been able to borrow millions of dollars through its bonds because it is a money-making enterprise: By exacting bridge and tunnel tolls it annually earns sufficient to yield millions of dollars net, after paying all its expenses, interest on its bonds, and other fixed charges. These immense net earnings or profits it has been setting aside to retire its bonds and thereafter to pay off the states' investment in the corporation; but there is no commitment or assurance that, when all its bonds and the states' investment have been paid, the corporation will not continue to exact tolls and continue to make profits.[5] The principal of and interest on its bonds are payable solely out of its earnings; its properties as

---

292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348, applying a related principle to statutory provisions allowing deductions in computing taxable income; we have just applied that related principle (per Chase, J.) in Commercial Union Assur. Co. v. Commissioner, 2 Cir., 144 F.2d 994.

[2] United States Trust Co. v. Anderson, 2 Cir., 65 F.2d 575, 89 A.L.R. 994, certiorari denied 290 U.S. 683, 54 S.Ct. 120, 78 L.Ed. 589.

[3] Shamberg had previously bought his bonds which were not part of that issue.

Incidentally, as the prices of all Authority bonds were presumably affected adversely by such advertised doubts, the decision of my colleagues, if not reversed, will probably cause the prices to rise, with a resultant windfall to many holders.

[4] Including advances and appropriations by the states (aggregating about $21,500,000) and grants by the United States (about $6,450,000), the total expenditures have been about $233,500,000, of which $205,551,582 came from the proceeds of the Authority's bonds and notes.

[5] The record indicates that some of its enterprises result in deficits and that

such (as distinguished from its earnings) are subject to no lien in favor of the bond-holders.

The question for decision is whether in § 22(b) (4) of the Revenue Act—which exempts from the federal income tax the "interest upon (A) the obligations of a State * * * or any political subdivision thereof"—Congress has exempted that part of the income of private owners of these corporate bonds consisting of the interest paid to them by this corporation.

My colleagues hold that Congress has done so, that the bonds of this company are either (a) "obligations of a state" or (b) "obligations of a political subdivision thereof." That seems to me to be a strained latitudinarian interpretation of the exemption statute, surely not its plain and unmistakable meaning:

(a) Since the states successfully took every precaution to see that these bonds are not state "obligations," I think that it flatly contradicts the wording of the Act to hold that nevertheless they are state obligations. If the majority's decision is correct, we seem to have here a case where A == not A, a result which, acceptable under some modern systems of logic,[6] cannot be squared with the logic that usually governs legal reasoning.

(b) If this very utility corporation, the Authority, had originally been privately owned, or if the states now sold their 10% investment in it to private persons, this company would surely not be a "political subdivision," despite the fact that it would, as a so-called "public service corporation," vicariously be performing for the states "traditional state functions," by supplying bridge and tunnel services to the public.[7] Because, instead of being owned by private persons, it is owned by the states (in the sense that they have made a 10% investment in it and will wholly own it when its bonds are paid), this company may properly be called a "state instrumentality." Congress, however, did not use that broad term (long familiar when the statute was first enacted in 1913) but the more restricted term "political subdivision." The exemption therefore covers only that particular class of state instrumentalities. I do not think that state-ownership of such a company[8] is sufficient to convert it into a "political subdivision."[9] I doubt whether my colleagues would so hold if its stock had originally been privately owned and, after its bonds had been issued, the states had bought its stock. The case here seems to me to be substantially the same.

3. These observations would have diminished force if it were true, as my colleagues state, that this utility corporation has been given many important "attributes of sovereignty" (or "sovereign powers of the state") not usually delegated to privately-owned public utility corporations.

---

these deficits are offset by the large profits made in its other enterprises.

[6] See, e.g., Korzybski, Science and Sanity (2d Ed. 1941).

[7] Such companies have been called "public service" corporations because they render services which could be directly rendered by the state as part of its "governmental" functions. Thus, in Munn v. Illinois, 94 U.S. 113, 122, 130, 24 L.Ed. 77, the Court said that railroads "exercise a sort of public office," and in Chicago, B. & Q. R. Co. v. Iowa, 94 U.S. 155, 161, 24 L.Ed 94, said that they are "given extraordinary powers, in order that they may better serve the public. * * *" In Wolff Packing Co. v. Court of Industrial Relations of Kansas, 262 U.S. 522, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280, the Court, speaking of such and other "public utilities," said they are "carried on under the authority of a public grant of privileges * * * which * * * imposes the affirmative duty of rendering a public service demanded by any member of the public."

To be sure, the category of "public utilities" can be expanded and need not consist of only those corporations which perform functions heretofore frequently discharged by governments. Cf. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Brandeis, J., dissenting in New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747. But the fact remains that, as observed in Flint v. Stone Tracy Co., 220 U.S. 107, 109, 31 S.Ct. 342, 55 L. Ed. 389, Ann.Cas.1912B, 1312, many such corporations engage in enterprises, beneficial to the public, in which governments have also often traditionally engaged.

[8] Here through a state investment therein of 10%.

[9] See the analogous discussion in Helvering v. Powers, 293 U.S. 214, 227, 55 S.Ct. 171, 79 L.Ed. 291, and in State of South Carolina v. United States, 199 U.S. 437, 454, 462, 463, 26 S.Ct, 110, 50 L.Ed. 261, 4 Ann.Cas. 737.

But I think that my colleagues' statement is unfounded:

(a) The Authority has police officers. But so, too, under New York and New Jersey statutes, do many private persons and corporations; Tyson v. Joseph H. Bauland Co., 186 N.Y. 397, 79 N.E. 3, 9 L.R.A., N.S., 267; Tucker v. Erie R. Co., 69 N.J.L. 19, 54 A. 557. (b) The Authority has the power of eminent domain; but that power is often vested in privately-owned utility companies.[10] (c) After the state compact was made, the state of New York by statute attempted to confer on the Authority subpoena power and certain powers to issue orders obligatory upon citizens. But the New York statutes conferring those powers are, I think, ineffective, as the state compact provides that no legislation conferring additional powers on the Authority shall be valid unless the legislatures of both states concur, and the New Jersey legislature has not concurred. (d) The Authority has made regulations with respect to the operation and maintenance of its bridges and tunnels, "which have been concurred in by the legislatures of both states" and violations of which are punishable by state laws; privately-owned utilities have often been similarly privileged. (e) The properties of the Authority have been exempted from state taxes in both states; but similar exemptions have been accorded organizations (churches, for instance) which because of that fact are by no means state "political divisions." (f) The Authority engages, pursuant to the compact, in certain activities relating to the development of the Port; but they represent a negligible portion of the Authority's total activities; in 1941, a typical year, only 0.47% of its revenues were expended thereon.

In sum, I think that no important "sovereign powers" of the states have been vested in the Port Authority, none sufficient so to distinguish it from an ordinary public utility company operating bridges and tunnels as to warrant a decision that it is a "political subdivision" of the states. According to the stipulation in this record, the "facilities owned or operated by" the Authority are "subject to regulatory laws and regulatory Commissions as if they were owned by a private corporation." If it be urged that the Authority, in supplying the public with bridge and tunnel service, discharges important "state" or "public" functions, the answer is that so, too, does a privately-owned bridge or tunnel or water or electric power or railroad company.

The dubiousness of my colleagues' interpretation of the statute is suggested by the lack of confidence of the Authority's learned General Counsel (expressed on May 31, 1938, long before the present proceedings commenced) in the position that the Authority could be categorized as a "political subdivision." In his written opinion of that date to his client, he maintained that its bonds and revenues enjoyed a federal tax immunity in no wise dependent on the statute but stemming wholly from the federal Constitution;[11] this immunity existed, he said, without regard to whether the Authority was a "political subdivision," it being sufficient that it was one of the states' "public instrumentalities"—a term not to be found in the statute.[12]

4. With the face of the statute adverse to the exemption, it would indeed seem to require some powerful reasons, extrinsic to the statute, to bring the interest of this corporation's bonds within its provisions. Nothing in the legislative history compels such a conclusion; the subject was not discussed in the Congressional debates or committee reports, for no such Authorities—no such state-owned (or city-owned) utility companies issuing bonds on which the state (or city) was not obligated—existed in this country when or before the statute was enacted in 1913. Nor has that subject ever been discussed in Congress since that date. Nor has any judicial decision (other than

[10] Cf. Flint v. Stone Tracy Co., 220 U.S. 107, 110, 172, 31 S.Ct. 342, 55 L. Ed. 389, Ann.Cas.1912B, 1312.

[11] I shall below discuss this constitutional argument.

[12] He said: "The immunity * * * cannot be cabined within the term 'political subdivision' either by regulation of the Treasury or an Act of Congress. * * * If an attempt is made to tax the bonds or revenues of the Port Authority, *the question* before the Court *will not be whether it is a political subdivi-*sion within the meaning of the regulations or the Act, but whether the functions burdened by the tax are of a type immune from taxation. * * * There is no reason to believe that the Supreme Court of the United States will at any time countenance the destruction of the essential sovereignty of the state through Federal taxation of the revenues or the borrowing power of the state, its political subdivisions, or *public instrumentalities.*" (Emphasis added.)

the present) ever considered it. Nor has the subject been dealt with in any Attorney General's opinion. Nor has any Secretary of the Treasury ever said, in a Treasury regulation or otherwise, that such interest was exempt.[13] Thus we have no unambiguous authoritative declaration—legislative, judicial, or administrative—to sustain my colleagues' decision.

5. The taxpayer, however, contends that Congress must be deemed to have intended in 1913 to exempt the interest on the bonds of every state-owned corporation, no matter in what business the corporation engages. My colleagues' position is less extreme: they say that Congress intended to exempt such interest if the state-owned corporation engages in an enterprise which, although not "strictly governmental," is of a kind which governments as well as privately-owned utility corporations have often undertaken. To support these positions the taxpayer and my colleagues argue that Congress in 1913, as the Supreme Court decisions then stood, lacked, and therefore presumably thought that it lacked, the constitutional authority to tax such interest.

I cannot agree. In 1905, eight years before the adoption of the 16th Amendment and passage of the statute, the Supreme Court, in State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L. Ed. 261, 4 Ann.Cas. 737, had decided that nothing in the Constitution forbade Congress to tax the earnings of state instrumentalities not engaged in what it called "strictly governmental" activities. The test which the Court there used to ascertain whether or not a state instrumentality came within that category was that applied by state courts in determining whether a city would be liable in tort for negligence.[14] The Court cited state court decisions de-

nying immunity for negligence when a city engages in a business which, although a common governmental function and beneficial to the public, is also frequently conducted by private persons (especially when the city makes a charge for the service from which it earns a profit).[15] The Court quoted with approval from Western Saving Fund Society v. Philadelphia, 31 Pa. 175, 72 Am.Dec. 730, to the effect that for a city to supply gas to its inhabitants "is no more a duty of *sovereignty* than the *supply of water*. Both these objects may be accomplished through the agency of individuals or private corporations, and in very many instances they are accomplished by those means." [15a] [199 U.S. 437, 26 S.Ct. 117, 50 L.Ed. 261, 4 Ann.Cas. 737] And elsewhere in the opinion, the Court, illustrating the potential evil consequences of denying the federal government the constitutional power to tax state activities which are not "strictly governmental," said (199 U.S. at page 454, 26 S.Ct. at page 113, 50 L.Ed. 261, 4 Ann.Cas. 737): "There is a large and growing movement in the country in favor of the *acquisition and management by the public of what are termed 'public utilities,'* including not merely therein *the supply of* gas *and water,* but also the entire railroad system." [16]

Recently the Supreme Court rejected the tort liability test in favor of one perhaps more generous to Congressional power.[17] But, in ascertaining the belief and thereby the intent of Congress in 1913, we should consider the judicial test then in vogue.[18] Doing so, it seems clear to me that Congress at that date, had it considered the subject, must have believed that there existed no constitutional barrier to a federal tax on the earnings of a state-owned corporation engaged in operating bridges and

---

[13] I shall discuss below the rulings of the Commissioner of Internal Revenue and try to show that they were neither authoritative nor consistent.

[14] As the discussion of this test and its application covers three pages of the opinion, I think my colleagues err in their cavalier treatment of it.

[15] At the time of the South Carolina decision, cities were, in many states, held immune from tort claims only in the conduct of a very limited kind of activities, like police protection and fire prevention.

The immunity was later broadened by decisions in many jurisdictions; but those later decisions are irrelevant, for here we are considering the test utilized

by the Supreme Court in the South Carolina case as it must have appeared to Congress in 1913.

[15a] Emphasis added.

[16] Emphasis added.

[17] Cf. Allen v. Regents, 304 U.S. 439, 451, 58 S.Ct. 980, 82 L.Ed. 1448; Helvering v. Gerhardt, 304 U.S. 405, 421, 58 S.Ct. 969, 82 L.Ed. 1427; Helvering v. Powers, 293 U.S. 214, 227, 55 S.Ct. 171, 79 L.Ed. 291. See our discussion in United States v. State of New York, 2 Cir., 140 F.2d 608.

[18] Cf. Great Northern R. Co. v. United States, 315 U.S. 262, 273, 62 S.Ct. 529, 86 L.Ed. 836; Helvering v. Griffiths, 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843.

tunnels. For such a corporation could not meet the immunity-from-tort-claims test as that test was described in the South Carolina case.

My colleagues underscore the fact that in that case the state instrumentalities made a large profit; they overlook the still larger profits of the Port Authority. Seeking to limit the scope of the South Carolina doctrine to instances where the business of the state's instrumentality is "private" and "commercial," [19] my colleagues also suggest that that doctrine was severely modified by a brief remark made in 1909 in Murray v. Wilson Distilling Co., 213 U.S. 151, 173, 29 S.Ct. 458, 53 L.Ed. 742, a remark to my mind irrelevant here as neither it nor the Murray case had anything to do with taxation. But my colleagues neglect the subsequent significant and detailed discussion of the South Carolina doctrine in 1911 in Flint v. Stone Tracy Co., 220 U.S. 107, 108, 172, 173, 31 S.Ct. 342, 357, 55 L.Ed. 389, Ann. Cas.1912B, 1312, .where, after citing the South Carolina case, the Court said: "It is *no part of the essential governmental functions of a state to provide means of transportation, supply artificial light, water, and the like.* These objects are often accomplished through the medium of private corporations * * *. The true distinction is between the attempted taxation of those operations of the state *essential to the execution of its governmental functions, and which the state can only do itself,* and those activities which are of a private character." [20] The Court at another point discussing the South Carolina case said (220 U.S. at page 158, 31 S.Ct. at page 351, 55 L.Ed. 389, Ann.Cas.1912B, 1312): "The exercise of such rights as the establishment of a judiciary, the employment of officers to administer and execute the laws, and similar governmental functions, cannot be taxed by the Federal government."

Thus, although the supplying of water to the public by a state has for centuries been a "customary governmental activity" [to use my colleagues' locution], the Supreme Court had plainly said that, if such a service by the state yielded it earnings, they were not constitutionally immune from federal taxation. With the South Carolina doctrine thus elucidated in 1911, I cannot agree with my colleagues that, under that doctrine as it stood in 1913 and as Congress then presumably understood it, the Constitution would not permit federal taxation of the earnings of such a state agency as the Port Authority. For the primary function performed by it is not one "which the state can only do itself"; if the supplying of water to the public, because it is "often accomplished through the medium of private corporations," is no "duty of sovereignty," "no part of the essential governmental functions of a state," then no more is the supplying of bridge and tunnel services.

Now, if in 1913 Congress believed that the earnings of such a state instrumentality could validly be taxed, then so much the more must Congress then have believed that nothing in the Constitution forbade Congress to tax the earnings of private persons who supplied such an instrumentality with commodities. And, since money is but one kind of commodity, it cannot, I think, be doubted (except by those who look upon money-lending as all but sacred) that Congress could, and in 1913 thought that it could, impose a valid tax on the interest paid to those who loaned money to such an instrumentality.

The taxpayer makes no logical reply to that proposition; indeed, the distinguished counsel for the taxpayer remarked in his oral argument that the distinction for which he contended could not be articulated in nicely logical form. He contented himself with saying, as he said in his brief, that "the power to borrow is an essential power of government," and that therefore interest on loans made to any state-owned corporation is constitutionally immune from federal taxation, no matter how devoid of "governmental" character the corporation's business may be; therefore, he argued, it must be assumed that Congress did not intend to tax such interest.

In blunt terms, the contention is this: If a person renders indispensable services to a state-owned entity, the earnings of which are not themselves tax-immune, his wages or salary may validly be taxed by the federal government; so, too, the rent he receives from the entity's use of his land, although that use is essential to its business. But,

---

[19] In fact, as the Court there recognized (199 U.S. at pages 453, 454, 26 S. Ct. at pages 113, 114, 50 L.Ed. 261, 4 Ann.Cas. 737), the state was in part discharging a governmental function, by exercising its "police power" in the control of the liquor traffic through state sales of liquor.

[20] Emphasis added.

says taxpayer, if a person loans money to that entity, the interest he receives for the use of his money cannot constitutionally be touched tax-wise by the United States.

That is a quaint argument. We have come a long way from the days when to lend money at interest was a sin, denounced as usury, but not so far, I think, that it has become a constitutionally-protected virtue. The taxpayer has failed to explain why a state-owned corporation is engaged in a "strictly governmental" function when it borrows money solely to enable it to conduct an enterprise which itself is not "strictly governmental." I conclude that this alleged constitutional argument does not sustain the contention that Congress intended to exempt interest on bonds like those of the Authority.

However, it does not at all follow from what has just been said that the Constitution, before the adoption of the 16th Amendment, permitted the taxation of interest on the general obligation bonds of states and municipalities. Certainly, no such tax could then have been levied on such bonds the proceeds of which were used for "strictly governmental" purposes. And, as ordinarily, it would have been impracticable to identify and differentiate such bonds from other general revenue bonds of states or municipalities, it was probably true that, in practical terms, Congress could not validly have taxed the interest on any such bonds.

But when the 16th Amendment was in process, Governor Charles Evans Hughes, in a Message to the New York legislature dated January 5, 1910,[21] recommended that it be not ratified because he apprehended that, as it contained the phrase "from whatever source derived," the Amendment would so enlarge the kinds of income subject to federal tax as to include "incomes derived from securities issued by the State and its municipalities."[22] Other distinguished persons, including Senators Borah and Root, disagreed with Governor Hughes. Thus Senator Root said on March 1, 1910, "I do not consider that the Amendment in any degree will enlarge the taxing power of the National Government or will have any effect except to relieve the

exercise of that taxing power from the requirement that the tax shall be apportioned among the several states." And Governor Fort, in a message of February 7, 1910 to the New Jersey legislature, said he did not believe that the Amendment would justify "the taxing of the securities of any other taxing power." Still other persons agreed with Governor Hughes; and the doubt remained. Accordingly, when the first income tax Act pursuant to the Amendment was in process of enactment in 1913, Representative Hull, in charge of the bill in the House, explained that, in order to avoid any constitutional question, the bill contained the provision (which is the present exemption section) that there should be excluded from taxable gross income "interest upon the obligations of a State * * * or any political subdivision thereof."[23]

Since the constitutional question raised by Governor Hughes and thus sought to be avoided related merely to the possible enlargement of federal power by the Amendment, it obviously did not relate to the constitutionality of taxation previously permitted under the doctrine of the South Carolina case. I see nothing in this legislative history to indicate that in 1913 Congress intended not to exercise all the taxing power it had had before the adoption of the Amendment.

True, Representative Hull also remarked that the statutory exemption provision had been inserted in order not "to arouse the antagonism of the states." That comment seems to me to be but another way of saying that Congress wanted to avoid the question raised by Governor Hughes, i. e., the question of whether the 16th Amendment so extended Congressional power as to allow taxation of bonds "issued by a state and its municipalities." As, at that time, no states owned or had ever owned any corporations like the Authority—with its bonds carefully so devised as not to be "obligations of the State"—I cannot accept my colleagues' suggestion that, to avoid state antagonism, Congress, when it exempted interest on "obligations of a State * * * or a political subdivision thereof," intended to immunize interest on such bonds. The brief reference in the debates

[21] Public Papers of Governor Hughes, 1910, pp. 71–76.

[22] Be it noted that four times the Governor explicitly referred to the bonds of the state and its "municipalities."

[23] We need not here consider whether

Congress, because of the "from whatever source derived" clause in the 16th Amendment, could validly levy such a tax, since Congress has not attempted to do so.

to such antagonism is a slimsy foundation for so liberal an interpretation of an exemption.

It will not do, I think, to say, as my colleagues say, that, if such Authorities had then existed and if Congress had had them in mind, it would probably have included interest on their bonds. That is pure conjecture. The admitted fact is that Congress did not then have them in mind. Whether for that reason or the reason already noted, undeniably it did not use apt words to describe these bonds. A court, in appropriate circumstances, may properly carry out, bar beyond their literal meanings, the clearly manifest "policies," of some statutes; but that doctrine is inapposite in the interpretation of a tax exemption statute. We should not, I believe, judicially rewrite such a statute to extend it to cover items to which Congress did not apply it. When Authorities of this kind first came into existence (about 1920), those interested in them could have asked Congress to amend the Act. They did not, and I think it is not up to the courts to legislate for their benefit on the unverifiable assumption that Congress, if asked, would have done so.

But from the fact that interest on such bonds was validly taxable and was not exempted, it does not by any means follow that Congress had the power or intended to tax interest on the bonds of state-created special assessment districts, many of which bonds had been issued before 1913. Most of such districts, organized for highway and other "public service" purposes of a kind for which privately-owned utility corporations are also often organized, had, however, been vested with the most important "sovereign power" of the states, that of levying taxes, a power never delegated to such privately-owned companies. These districts had been able to borrow money through the sale of their bonds because the exercise of that taxing power had been pledged to secure the bonds. In the light of what was said in the South Carolina case about "sovereignty," it was by no means clear whether Congress, prior to the 16th Amendment, could validly have taxed them. An effort to do so might therefore well have raised the same question as that raised as to taxation of general revenue bonds and might well have aroused the

same state antagonism. Consequently, it could most plausibly be argued that Congress in 1913 intended to include these districts in the "political subdivisions" of a state and thus to exempt their bonds.[24]

Within a few months after the enactment of the statute, the Secretary of the Treasury put that problem to the Attorney General who, early in 1914, rendered and published an opinion in which he said that interest on bonds of such special assessment districts was exempt. That opinion stressed the fact that these districts (a) were engaged in functions often theretofore performed by governments and also (b) possessed the power to levy taxes. The Attorney General pointedly stated that the districts were "given the *power of taxation —perhaps the most important power possessed by the State*."[24a] In the six and one-half pages of this opinion, thirteen times he mentioned "taxation," "taxes," or "special assessments," and repeatedly referred to the districts as "special assessment districts." While he did not say so, he perhaps implied that he would have ruled similarly as to districts having important sovereign powers of the state other than that of taxation. But I find it most difficult to read into his opinion the implication that he would have reached a similar conclusion as to a state-owned corporation (a) having no taxing power or other important sovereign powers not possessed by privately-owned utility companies and (b) not engaged in a "strictly governmental" operation. If he had meant his opinion to have the wide sweep which my colleagues ascribe to it, he could have made his meaning clear in a few crisp sentences, and would not, I think, repeatedly have mentioned the districts' taxing power. After citing numerous state court decisions concerning such districts, he said, "These decisions establish that districts lawfully created by the State for the purpose of constructing works of the character referred to above, and of *levying a tax therefor,* are portions of the State itself, *invested with a part of its sovereign functions,* and are therefore political subdivisions thereof."[24b] The Attorney General, in this reference to "sovereign functions," was obviously thinking of State of South Carolina v. United States, supra (which he cited) and Flint v.

---

[24] Note Governor Fort's comment, above quoted, that the 16th Amendment would not enlarge Congressional authority to permit the "taxing of the securities of any other taxing power."

[24a] Emphasis added.

[24b] Emphasis added.

Stone Tracy Company, supra. He was certainly not thinking of entities like the Authority since, as previously noted, no such entities then or theretofore existed in the United States.

My colleagues advert to the opinion given by a subsequent Attorney General in 1937 (relating to an irrigation district, having the usual taxing powers of such an instrumentality) in which he referred with approval to the 1914 opinion; but it is significant that this 1937 opinion construed the earlier opinion as saying that "political subdivision" may denote "any subdivision of the state created for a public purpose although *authorized to exercise a portion of the sovereign power of the state* only to a limited degree." [25]

I fail to see in the legislative history or in these Attorney Generals' opinions any adequate warrant for my colleagues' decision.

6. There remains to be explored the administrative interpretation of the Act.

In 1918, some four years after the Attorney General's opinion of 1914, the Secretary of the Treasury first issued the present regulation. It is important to note that, if that regulation was broader than the statute which it purported to interpret, then to that extent it was invalid, was "a mere nullity." [26] As we must presume that the Secretary intended the regulation to be valid, we should construe it, if possible, so that it does not involve a more extensive exemption than that granted by the statute. That we can easily thus construe it appears from the following.

The regulation, in its first sentence, merely quotes the statute. The second sentence says: "Obligations issued by or on behalf of the state or a duly organized political subdivision acting by constituted authorities empowered to issue such obligations, are the obligations of a state or a political subdivision thereof." If that sentence stood alone, something might perhaps be said for the position of my colleagues that the regulation interprets "political subdivision" in the statute to exempt interest on any obliga-

tions issued by any kind of agency, owned by a state, whether or not its functions are "strictly governmental," if only it conducts an enterprise of a kind which, although often conducted by privately-owned corporations, has also often been undertaken by governments. But the regulation does not stop there. It defines "the term 'political subdivision' within the meaning of the exemption" to denote "any division of the state which is" either (1) "a municipal corporation" or (2) "to which has been delegated the right to exercise part of *the sovereign power of the state.*" [27]

Ah, says the taxpayer, any agency of the state is a "political subdivision" exercising part of the "sovereign power," if it is authorized to issue "obligations," because borrowing money is, the taxpayer asserts, a sovereign power. But such a reading of the regulation would make it tautologous. For the regulation begins by referring "to obligations" of a "political subdivision," so that, if the mere right to issue "obligations" rendered a state agency a "political subdivision," there was no need for the regulation to go further and to say that "obligations" of a "political subdivision" (other than a municipality) are only those issued by a "division of the state to which has been delegated part of the sovereign power of the state." Indeed, the balance of the regulation goes to show that, in speaking of "sovereign power," it meant more than merely the power to borrow money, and that the Secretary, in writing the regulation, had in mind what the Attorney General's opinion had said about the taxing power; for, immediately following the reference in the regulation to "sovereign power," the regulation cites, as illustrative of bodies (other than states or municipalities), interest on whose bonds are exempt, "special assessment districts, such as road, water, sewage, etc., and similar districts and divisions of a state." [28]

The Authority here is not a "special assessment district." Nor is it "similar" to any such districts since it completely lacks the characteristic stressed in 1914 by the Attorney General as "the most important.

---

[25] Emphasis added.
[26] Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528; Helvering v. Janney, 311 U.S. 189, 194, 61 S.Ct. 241, 85 L.Ed. 118, 131 A.L.R. 980; Maass v. v. Higgins, 312 U.S. 443. 61 S.Ct. 631, 85 L.Ed. 940, 132 A.L.R. 1035.

[27] Emphasis added.
[28] This explains the cases cited by my colleagues such as Commissioner v. Pontarelli, 7 Cir., 97 F.2d 793; Commissioner v. Carey-Reed Co., 6 Cir., 101 F.2d 602, 121 A.L.R. 1272; Bryant v. Commissioner, 9 Cir., 111 F.2d 9.

power possessed by the state"—the taxing power.[29] And, as already noted, the Authority has no other important "sovereign powers" of the states.

I see nothing in the word "political" or in the word "subdivision" or in anything else in the regulation, to sustain the conclusion that the Authority is a "political subdivision."

The taxpayer sets up a final line of defense based upon the three words, "on behalf of," in that part of the regulation reading "obligations issued by or on behalf of the State." These three words, it is argued, are so broad as to exempt the interest on the bonds of any state-owned corporation, no matter what its business, and regardless of whether or not it is a "political subdivision" (i. e., even if it has no taxing or other sovereign state power). On this basis, the regulation exempts interest on the bonds of such a corporation conducting a dry-goods store, or a market, or a theater, although those bonds and the interest are not payable except out of the corporate earnings. (It is noteworthy that the State of New York has created an Authority which, charging admissions, conducts an "industrial exhibit," and another which similarly runs a "planetarium.")

My colleagues, seemingly mindful of the defects of this extraordinary argument, here again take a somewhat narrower position: They maintain that, according to the regulation (although it does not say so), the exemption arising from "on behalf of" applies to interest on bonds of such a corporation only if it conducts a "public" business which, while not necessarily "strictly governmental," is one in which both privately-owned corporations and governments have traditionally engaged. Even thus limited,[30] this interpretation is surprising. As everyone knows that draftsmen often use the phrase "by or on behalf of" when they mean by a principal or by an agent au-

thorized to obligate the principal, the three words "on behalf of" are, at best, ambiguous and afford a slender basis indeed for construing an interpretative regulation so broadly as to deprive the government of large revenues. The argument, on analysis, appears to be a variant of that which I previously discussed: The Authority is a corporation which, in operating sorely-needed bridges and tunnels, discharges, vicariously for the states, important "state functions" serving the public welfare; therefore it acts "on behalf of" the states; consequently, its bonds are obligations issued "on behalf of" the states. The reductio ad absurdum of this argument is, I think, that the same could be said of a privately-owned utility company operating these identical bridges and tunnels.

Had the Secretary intended his regulation to have the broad scope ascribed to it by my colleagues, it is strange that he issued so lengthy a regulation; it would have sufficed to say, "The statute exempts interest on the obligations of a state, or municipality, or political subdivision, or of any state-owned or city-owned corporation or instrumentality engaged in any enterprise of a kind heretofore often conducted by governments as well as by privately-owned corporations." And if such had been the meaning of the regulation, it patently would, I think, have exceeded the intent of Congress which, in turn, had it intended to grant so wide an exemption, would have said so in plain terms, would at least have substituted the word "instrumentalities" for "political subdivisions."

Since the regulation should be read as of the date when it first issued, it is appropriate to ask why the Secretary of the Treasury, when, in 1918, promulgating an interpretative regulation, should be deemed to have intended to include, in excess of the statute, bonds of a kind of which he could then have known nothing.[31]

---

[29] The regulation states: "Special tax bills issued for special benefits to property, if such tax bills are legally collectible only from owners of the property benefited, are not the obligations of a State, Territory, or political subdivision." Thus it would appear that even the power of taxation does not alone confer sufficient "sovereign power." It may perhaps be that it was intended that the obligations must be those of a geographical district, the affected citizens of which have the right to elect its officers.

[30] My colleagues' position is even more limited, for they assume (erroneously as I believe I have shown) that the Authority has many important sovereign powers.

[31] According to the decisions of the New York Courts, the published opinions of the Attorney General of that state, and the stipulation in this record, the bonds here, neither as to principal nor interest, are obligations of, or involve any pledge of the credit of, the state. It is not easy, then, to see why these bonds should be held to have been issued "on behalf of" the state.

7. To summarize the foregoing: (a) The regulation can, without awkwardness, be so interpreted as not to go beyond the statute. (b) The statute does not, I think, exempt interest on bonds like those of these Authorities. (c) Neither, then, does the regulation, if so construed as to stay within the statute.

8. The taxpayer and my colleagues also rely upon explicit administrative discussions of bonds of Authorities subsequent to the issuance of the regulation. The first of such discussions occurred in 1932—nineteen years after the first enactment of the present statutory exemption provision and fourteen years after the first promulgation of the regulation. That discussion took the form of mere letters written by the Commissioner, letters which were not approved by the Secretary of the Treasury. Even if, in purchasing or retaining his bonds, taxpayer's decedent had known of, or relied upon, these letters, it would seem clear that no estoppel would have resulted, since the government cannot be thus estopped.[32] But there was no such reliance; the taxpayer does not even intimate that taxpayer's decedent had any knowledge of these letters or relied on them in purchasing or retaining his bonds; it is said merely that he relied upon the regulation.

It is urged, however, that these letters evidence a uniform administrative interpretation of the statute (to the effect that it exempted from income tax the interest on such bonds) to which we must give great weight. Even assuming that the letters disclosed such a consistent administrative attitude, this contention would be untenable.

For even the formally-published rulings of the Commissioner, when not embodied in a regulation or Treasury Decision, possess little, if any, interpretative value, because of the express warning, contained for many years in the Internal Revenue Bulletins, that such rulings "have none of the force of Treasury Decisions and do not commit the Department to any interpretations of the law." The Supreme Court has stressed the significance of that warning;[33] and it finds ample justification in the fact that the statute requires that regulations must have the approval of the Secretary, while such rulings by the Commissioner are not thus approved.

Moreover, these letters of the Commissioner show so little consistency in interpreting the statute that even the majority opinion of the Tax Court in the companion case of Commissioner v. Estate of White, 3 T.C. 156, in the only reference it makes to them, speaks of the "ambiguity of numerous administrative expressions."[34] The appropriateness of that comment appears from the following: The first of these letters was written in 1932.[35] Two were written in June of that year. What was the practice of the Commissioner for the next four years we do not know. We do know that some four years later, in August 1936, he stated in a letter that interest on bonds of the Richmond Bridge Corporation (an entity like the Authority here) was not exempt. Some seven months later, in March 1937, he wrote a letter retracting that opinion. In that same year (1937) he sent out five other letters—making six in all—favorable to the exemption of interest on bonds

---

[32] See, e.g., Seeley v. Helvering, 2 Cir., 77 F.2d 323, 324.

[33] Helvering v. New York Trust Co., 292 U.S. 455, 468, 54 S.Ct. 806, 78 L.Ed. 1361; Biddle v. Commissioner, 302 U.S. 573, 582, 58 S.Ct. 379, 82 L.Ed. 431.

[34] The majority opinion of the Tax Court in the Shamberg case makes no reference to these rulings.

[35] Respondents in the White case cite a Commissioner's letter of November 3, 1923, stating that interest on certain Michigan State Fair bonds was exempt. But the letter states that the bonds were executed in the name of the state; and that the mortgaged property belonging to the state, was, in the mortgage, expressly conveyed by the state to the mortgage trustee. Taxpayers in the White case, assert that, under the Michigan Constitution, "no state debt could be issued for that purpose"; no authorities are cited

in support of that statement and the question was not discussed in the letter of the Commissioner who seemed to have considered that the bonds were, as they purported to be, state obligations. Significantly, the taxpayer in the Shamberg case does not cite this letter.

Respondent in the White case, also cites the Commissioner's letter of May 20, 1929 which stated that interest on bonds of the Alabama State Bridge Corporation was exempt. But the correspondence with the Commissioner contained in the present record shows that the interest was payable not only out of bridge tolls but also "out of the residue from the gasoline tax * * * or out of any funds in the Treasury" of the state. Again, significantly, respondent in the Shamberg case does not cite this letter.

of such Authorities. (One of these six letters, dated February 17, 1937, related to the bonds of the Triborough Bridge Authority, the subject of our decision in the companion case of Commissioner v. Estate of White, 2 Cir., 144 F.2d 1019.) In April 1938, the Commissioner gave two such favorable rulings in letters as to bonds of similar Authorities. But a few months later, in letters of October 3 and November 4, 1938, he ruled adversely as to interest on bonds of such a Louisiana agency. In 1939, he wrote letters refusing to rule on the exemption of interest on the bonds of a New York Bridge Authority and of a Maine Harbor Authority. This discussion covers all the rulings to which my colleagues refer in their opinion. (Incidentally, they err, I think, when they indicate that the Commissioner made a ruling as to the exemption of interest on the bonds of the Port Authority; the only rulings relating to that Authority to which our attention has been called are one in 1936 by the Collector of the New York district and one in 1939 by a "revenue agent in charge" in Huntington, West Virginia.)

I think that we should give no weight to any of these rulings.

9. The taxpayer urges that the re-enactment of the statute amounted to an adoption of the regulation as a Congressional interpretation of the Act, citing Hartley v. Commissioner, 295 U.S. 216, 220, 55 S.Ct. 756, 79 L.Ed. 1399. If the regulation here is construed (as I think it can and should be) so as to stay within the original Congressional intention expressed in the statute, and if that intention is read as I read it, then the re-enactment doctrine will do this taxpayer no good. What is more, that doctrine, which since the Hartley case has been severely criticized,[36] has been much weakened by recent Supreme Court deci

sions.[37] Moreover, the Supreme Court has held that a regulation which goes beyond the statute is not to be regarded as having been adopted by a reenactment of the statute.[38] This court held similarly (per Judge A. N. Hand) in United States Trust Company v. Anderson, 2 Cir., 65 F.2d 575, 89 A.L.R. 994, certiorari denied 290 U.S. 683, 54 S.Ct. 120, 78 L.Ed. 589. The question there was the taxability under the 1926 Act, 26 U.S.C.A.Int.Rev.Acts, pages 145 et seq., 163, of interest on an award against a city in condemnation proceedings; in 1920, the Commissioner, in a published Office Decision, had ruled that such interest was exempt; the statute was subsequently re-enacted twice (in 1924 and 1926); in 1931, the Commissioner withdrew the 1920 ruling in a new Office Decision.[39] This Court held that the 1920 ruling was at variance with the statute and had no effect.

And finally there is the fact that the Supreme Court in Burnet v. Chicago Portrait Company, 258 U.S. 1, 20, 21, 52 S.Ct. 275, 282, 76 L.Ed. 587, held that, in considering ambiguous legislation, a regulation itself ambiguous (as is that here) "cannot be deemed to determine satisfactorily the interpretation of the statute." In that case the 1918 Revenue Act, after having been interpreted by an ambiguous regulation, was re-enacted in 1921, and the Court refused to follow the regulation.[40]

Before 1932 (at which time the Commissioner wrote his first letter expressing an opinion that interest on bonds of this type was exempt), the exemption section of the statute had been re-enacted four times (i.e., in 1921, 1924, 1926 and 1928) after the issuance of the regulation in 1918. But it is said that significance must be attached to the re-enactments of the statute (in 1932, 1934, 1936 and 1938) after the Commissioner wrote the letters discussed above.

---

36 See, e.g., Paul, Studies in Federal Taxation, Third Series, 420ff; Brown, Regulations, Reenactment, and the Revenue Act, 54 Harv.L.Rev. 377; cf. F. W. Woolworth Co. v. United States, 2 Cir., 91 F.2d 973, 975.

37 Helvering v. Reynolds, 313 U.S. 428, 432, 61 S.Ct. 971, 85 L.Ed. 1438, 134 A.L.R. 1155; Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368; Helvering v. Wilshire Oil Co., 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101; Helvering v. Griffiths, 318 U.S. 371, 395, 396, 63 S.Ct. 636, 87 L.Ed. 843.

38 Koshland v. Helvering, 298 U.S. 441, 446, 447, 56 S.Ct. 767, 80 L.Ed. 1268,

105 A.L.R. 756 (see page 448 of 298 U.S. and page 770 of 56 S.Ct.); M. E. Blatt Co. v. United States, 305 U.S. 267, 279, 59 S.Ct. 186, 83 L.Ed. 167 (see page 272 of 305 U.S. as to reenactments); Maass v. Higgins, 312 U.S. 443, 447, 61 S. Ct. 631, 85 L.Ed. 940, 132 A.L.R. 1035 (see Saks v. Higgins, D.C., 29 F.Supp. 996, 1000 as to re-enactment).

39 The date of the new ruling is given in the lower court's opinion, D.C., 60 F. 2d 391, 393.

40 Cf. Sanford's Estate v. Commissioner, 308 U.S. 39, 49–54, 60 S.Ct. 51, 84 L.Ed. 20.

However, not only was there "ambiguity" in those "administrative expressions" (as even the majority of the Tax Court has observed) but, more important, the Supreme Court has held that the re-enactment doctrine does not apply to rulings not contained in regulations or Treasury Decisions. Helvering v. New York Trust Co., 292 U.S. 455, 468, 54 S.Ct. 806, 78 L.Ed. 1361.

Therefore, I cannot agree with the suggestion that Helvering v. Griffiths, 318 U.S. 371, 402, 63 S.Ct. 636, 87 L.Ed. 843, has any bearing here. There the question was whether Congress, in amending. the Revenue Act in 1936, intended to wipe out the doctrine of Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. The Court referred to the Congressional debates as showing no such intention, and pointed to the fact that, after the 1936 Amendment of the Act, the Treasury had issued regulations "which plainly construed" the Amendment "not as repudiating Eisner v. Macomber by taxing stock dividends but as exempting them and adopting the existing decisions, including Eisner v. Macomber" [318 U.S. 371, 63 S.Ct. 645, 87 L.Ed. 843]; the Court pointed out the same history as to the 1938 Act. In the light of these facts, the Court used the language to which the taxpayer refers.[41] It is significant that the Court (318 U.S. at pages 395, 396, 63 S.Ct. at page 649, 87 L.Ed. 843),

after speaking of an "affirmative indication" that the regulations had been "called to the attention of Congress," went on to say: "The effect of reenactment in the absence of such affirmative indications of agreement has been stated in various and not entirely consistent terms [citing recent cases in a footnote]. This is a question we do not now need to examine, for there are in this case many indications that Congress was in complete agreement with the Treasury on the question of the taxability of the stock dividends here involved." In the instant case, there are no "affirmative indications" that Congress knew of the Commissioner's letters, and the situation here is in other respects markedly different from that in Helvering v. Griffiths: there have been no judicial decisions which have so much as hinted at the correctness of the statutory interpretation upon which the taxpayer here insists.

10. Contrary to taxpayer's suggestion, there is here no history of Congressional refusal to amend the statute in order to impose a tax on the interest on such bonds: The many unenacted bills to which taxpayer refers related not to taxation of such bonds but to taxation of all state and municipal bonds regardless of their character; failure to enact those bills would be pertinent, if at all, only in a case relative to interest on ordinary general obligation bonds.[42]

---

[41] The taxpayer quotes the following part of the opinion: "We are asked to make a retroactive holding that for some seven years past a multitude of transactions have been taxable although there was no source of law from which the most cautious taxpayer could have learned of the liability. If he consulted the decisions of this Court, he learned that no such tax could be imposed; if he read the Delphic language of the Act in connection with existing decisions, it, too, assured him there was no intent to tax; if he followed the Congressional proceedings and debates, his understanding of nontaxability would be confirmed; if he asked the tax collector himself, he was

bound by the Regulations of the Treasury to advise that no such liability existed. It would be a pity if taxpayers could not rely on this concurrent assurance from all three branches of the Government. But we are asked to brush all this aside and simply to decree that these transactions are taxable anyway."

[42] That such non-action by Congress should not, at best, be given much weight, cf. Helvering v. Griffiths, 318 U.S. 371, 401, 402, 63 S.Ct. 636, 87 L.Ed. 843; Helvering v. Hallock, 309 U.S. 106, 119–121, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368; cf. Helvering .v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.