**COMMISSIONER OF INTERNAL REVE-
NUE v. WHITE'S ESTATE et al.**

No. 395.

Circuit Court of Appeals, Second Circuit.

Aug. 24, 1944.

Samuel O. Clark, Jr., Asst. Atty. Gen.,
and Sewall Key, J. Louis Monarch, and
Bernard Chertcoff, Sp. Assts. to the Atty.
Gen., for petitioner, Commissioner of Internal Revenue.

Hawkins, Delafield & Longfellow, of
New York City (Lewis L. Delafield, Jr.,
of New York City, and Raymond P. Mc-
Nulty, of Brooklyn, N. Y., of counsel), for
respondents.

Lewis L. Delafield, Jr., of New York
City, for Triborough Bridge Authority
amicus curiæ.

Before AUGUSTUS N. HAND,
CHASE, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This proceeding involves deficiencies in
income taxes assessed against Caroline
White, deceased, and paid under protest.
The Tax Court held that she had overpaid
such taxes to the extent of $2,308.59 for
1938, and $1,995.52 for 1939.

The question raised by this petition
to review the determination of the Tax
Court is whether interest on the bonds of
the Triborough Bridge Authority owned by
the decedent were exempt from income tax
under Section 22 (b) (4) of the Revenue
Act of 1938, 26 U.S.C.A. Int.Rev.Code, §
22 (b) (4). A majority of the Tax Court
held that they were exempt and for that
reason that the decedent had overpaid her
taxes for 1938 and 1939. In our opinion
in Commissioner v. Estate of Shamberg,
144 F.2d 998, filed herewith, we sustained
the ruling of the Tax Court that interest
on the bonds of the Port of New York Au-
thority is exempt under the above statute.
Our discussion in that opinion requires us
to say little, if anything, more as to Sec-
tion 22 (b) (4) of the Revenue Act and
Treasury Regulations 101, Art. 22 (b) (4)-1
which seem to render the interest on the
Triborough bonds exempt from income tax
like the bonds of the Port of New York
Authority in the other case.

The Triborough Bridge Authority was
created by Chapter 145 of the Laws of
1933, as amended by Chapter 3 of the Laws
of 1937, of the State of New York as a
"body corporate and politic constituting a
public benefit corporation." By the New
York General Corporation Law, Section 3
(4), Consol.Laws N.Y. c. 23, a public ben-
efit corporation is "a corporation organ-
ized to construct or operate a public im-
provement wholly or partly within the
state, the profits from which enure to the
benefit of this or other states, or to the
people thereof."

The Act creating the Authority provides:

"It is hereby found, determined and declared that the creation of the authority and the carrying out of its corporate purposes is in all respects for the benefit of the people of the state of New York, for the improvement of their health and welfare, and for the increase of their traffic and prosperity, and is a public purpose, and that the project is an essential part of the public highway system, and that the authority will be performing an essential governmental function in the exercise of the powers conferred upon it by this act, * * *." Laws N.Y.1933, c. 145, § 13, as amended by Laws N.Y.1937, c. 3, § 11.

The Authority owns and operates two public bridges which form a vital part of the New York State and City Highway System, are wholly within the State of New York and carry intrastate traffic as part of that system. They are constructed pursuant to plans approved by the War Department because they are across navigable rivers but, since they are fully within a single state, the Secretary of War had no right to prescribe the tolls.

Under the state law creating the Authority it acquired the power to construct, maintain and operate bridges connecting three Boroughs of the City of New York, to acquire necessary property, with the city's consent, in the name of the city either by purchase or condemnation, to make use of city agents, employees and facilities and to issue bonds for constructing the bridges. The statute under which it was organized also provided that the bonds should be legal investments for fiduciaries, should be exempt from state taxation other than transfer and estate taxes, should not be debts of the city or state and should be payable only out of funds of the Authority. It also provided that the state would not alter the right of the Authority to collect the tolls necessary to fulfill the terms of the bonds.

The bridges were built by the city. It financed their construction from its Tax Note Fund in the amount of $218,721.34 and from the proceeds of sales of its long-term corporate stock in the amount of $5,162,509. On April 28, 1933, the Mayor of New York appointed the three members of the Authority, who were subject to removal by him for cause. The Authority issued all of its bonds by virtue of the state statute under which it was organized and pursuant to resolution adopted by its members. The bonds were never approved by the electors of the state at any election and the Comptroller of the City of New York has never included them in any of his statements of the indebtedness of the city. After the Authority was organized in 1933 the engineering force of the City Bureau of Plant and Structure, which had theretofore been engaged in the construction work, and all records relating to the bridges were transferred to the Authority. In 1933 it applied to the Federal Emergency Administrator of Public Works for a loan and grant, the application was granted, and the United States, through the Administrator, made a grant of $9,200,000 and a loan of $35,000,000 by purchasing bonds of the Authority in that amount under an agreement dated September 1, 1933, which required the Authority to furnish an opinion by bond counsel that the bonds and interest would be exempt from all taxes imposed by the United States under the Constitution or by the State of New York. Such an opinion was furnished.

The bonds involved in this proceeding were issued in 1937 to the amount of $53,000,000 and were used in part to refund the $35,000,000 bonds issued in 1933 and 1937 held by the Reconstruction Finance Corporation. When the Authority issued its 1937 bonds it asked the Commissioner for a ruling and was advised by him that the interest was exempt from income tax. He said in a letter to Robert Moses, Chairman of the Authority (dated February 17, 1937), the following:

"It is believed that the Triborough Bridge Authority is in effect an instrumentality of the City of New York, a political subdivision of the State of New York; that the bonds issued by such Authority will be, in effect, bonds of the city issued in the exercise of its borrowing power; and that interest on such bonds will, therefore, be exempt from Federal income tax."

The Authority is plainly a subdivision of state government empowered to exercise governmental functions on behalf of the City of New York which acquired through state legislation the right to delegate its powers to operate and maintain the toll bridges. The Authority is in essence a Department of the city but so organized as not to involve the city in direct liability to persons holding Triborough bonds. Its functions are as traditional and primary state functions as any one can imagine except those of enacting and enforcing gen-

eral laws. Under the decisions its activities would universally be regarded as state functions. Graves v. People of State of New York ex rel. O'Keefe, 306 U.S. 466, 477, 59 S.Ct. 595, 83 L.Ed. 927, 120 A.L.R. 1466; Brush v. Commissioner, 300 U.S. 352, 372, 57 S.Ct. 495, 81 L.Ed. 691, 108 A. L.R. 1428; Kansas City Bridge Co. v. Alabama State Bridge Corp., 5 Cir., 59 F.2d 48, 49; Gaynor v. Marohn, 268 N.Y. 417, 432, 198 N.E. 13; Robertson v. Zimmerman, 268 N.Y. 52, 65, 196 N.E. 740; People ex rel. Buffalo and Fort Erie Public Bridge Authority v. Davis, 277 N.Y. 292, 298, 14 N.E.2d 74.

■ It is argued that whether the Authority be viewed as a political subdivision of the state, or as an agency of the city acting on behalf of the state, the exemption statute cannot apply because the bonds are obligations of the Authority only and not of the city. But if the city had continued to construct and had thereafter operated the bridges and collected the tolls and had issued its own bonds for the benefit of the enterprise instead of those of the Authority, it is not disputed that the interest on the bonds would have been free from income tax. While we realize that tax exemptions are matters of legislative grace and must be found in the appropriate statutes, yet there is a limit to the technical interpretation even of an exemption statute. The reason for the exemption of course was to free the states from the burden of income taxes on their investments in enterprises for the public welfare. It can make no difference whether the city or its alter ego is liable. In either case the burden would be upon a governmental activity and that is the substance of the grievance both of the Authority and of the taxpayer. The motives which induced the creation of a public corporation to operate the bridges, instead of leaving them wholly and literally to be managed by the city, that is, the form in which the municipal activities were to be exercised, seems to a majority of the court quite immaterial. The moneys of the Authority are paid to the Comptroller of the city pursuant to the organic law, the title to the lands is in the city and, after the obligations of the Authority have been paid in full, all its properties and rights pass to and become vested in the city. To distinguish between such an agency and the city in regard to the exemption seems to us purely technical.

Bonds of this character as well as the bonds in question have always been regarded as exempt and have been so held by the Commissioner of Internal Revenue.

Because Section 22 (b) (4) of the Revenue Act of 1938 and the Regulations applicable thereto have in the opinion of the majority of this court rendered the interest on the taxpayer's bonds exempt from income tax, we see no reason to discuss the question whether there is any constitutional prohibition against the tax and rest our opinion, as we did in the case of Commissioner v. Estate of Alexander J. Shamberg, deceased, solely upon the exemption.

In both of these important litigations we have been afforded all possible aid by counsel for the Commissioner and for the taxpayers in briefs which have been kept within a most reasonable compass and have said everything which we think could have been said on behalf of the respective parties.

Order affirmed.

FRANK, Circuit Judge (dissenting).

As I said in the companion case of Commissioner v. Estate of Shamberg, 144 F.2d 998, I would not go to the stake to vindicate my position. But I think that my reasons for dissenting in that case, if they are cogent, apply here with somewhat greater force; for there can be even less pretense that the Authority here has been vested with any significant part of the "sovereign power of the State." This Bridge Authority is engaged in a business of a kind which, while often conducted by state governments, has also often been conducted by privately-owned public utility companies; I think, therefore, that it cannot be said that the Authority's activities are "strictly governmental" (or are what my colleagues call "primary state functions") within the doctrine of State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas.737, and Flint v. Stone Tracy Co., 220 U.S. 107, 108, 172, 173, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas. 1912B, 1312—which were authoritative when Congress in 1913 first enacted what is now § 22(b) (4)—or within the doctrine of later Supreme Court decisions (if they are relevant here, which I doubt).[1]

No one would think of contending that interest on the bonds of a privately-owned utility company, operating a much-needed

---

[1] I have discussed the cases cited at length in my dissent in the Shamberg case.

bridge under a franchise from a city, is tax-exempt on the ground (a) that the state or the city has delegated to the company a "traditionally governmental activity" and that thereby the company became a "political subdivision" of the state or (b) that the company, in issuing its bonds, did so "on behalf of" the city or the state; such a contention would not stand up, despite the fact that the company vicariously performs a "state" or city function for "the public welfare." My colleagues' position must, then, rest essentially on the city's financial investment in the Authority. As, patently, a purchase by a city of some of the stock of such a utility company would not render the interest on its bonds immune from federal tax, the rationale of the majority opinion seems to be that here the city's investment is such that, when the bonds are fully paid, the city will be sole owner of the property. My colleagues thus seem to hold in effect as follows: If a city owns all the stock of a public utility company which operates a toll bridge, and even if the company's bonds, as to principal and interest, are payable exclusively out of the company's earnings (the bondholders having no lien on the company's property, as distinguished from its earnings, and there being no liability on the part of the city), the interest paid by the company to its bondholders is not a part of their income subject to the federal income tax. On grounds set forth in detail in my Shamberg dissent, I think that neither the Constitution, nor the Revenue Act, nor the regulation, justifies such a conclusion.

It is true, as my colleagues say, that, under the Act, the interest would have been exempt—*if* the city "had issued its bonds for the benefit of the enterprise." But that is precisely what the city did not do. It took pains not to do so because, if it had, the bonds would have been its obligations within the debt limitation imposed by state law. The city's precautions prevented the Authority from becoming the city's "alter ego," as my colleagues call it; the entire plan was avowedly designed to preclude alter-egoism, for the Authority is exactly not the city's "double," "counterpart" or "second self." [2] Accordingly, I do not agree that "to distinguish between such an agency and the city" is "purely technical." [3] Such a distinction seems to me of marked importance when a court is asked so to construe an ambiguous statute as to grant a tax exemption.

I have in my dissent in the Shamberg case discussed the letter of February 17, 1937 from the Commissioner to the Authority's Chairman. I have there shown that, under the decisions of the Supreme Court, such a letter, because not issued or approved by the Secretary of the Treasury, has no such effect as a Treasury regulation, especially in the light of the express warning, published for many years in the Internal Revenue Bulletins, that such rulings "have none of the force of Treasury Decisions and do not commit the Department to any interpretation of the law"; that this letter was one of a series in which, over a period of several years, the Commissioner took varying and inconsistent positions concerning the taxability of interest on bonds of such Authorities; and that nothing indicates that the attention of Congress was brought to this letter or similar letters. Respondents do not even pretend that their decedent purchased her bonds with knowledge of, or in reliance on, that letter. It affords no basis for an estoppel. For the reasons stated in my dissent in Shamberg, I think my colleagues are in error when they say that "bonds of this character have always been regarded as exempt * * *." Even the majority of the Tax Court, when deciding in favor of this taxpayer, spoke of the "ambiguity of numerous administrative expressions." [4]

---

[2] Courts frequently use the words "alter ego" when they hold a parent company liable for the debts or torts of its subsidiary.

[3] It is generally recognized that "technical" is usually but a pejorative used to defend a conclusion reached on other grounds.

A wag has said that a lawyer always loses, never wins, a case on a "technicality."

[4] In my dissenting opinion in the Shamberg case, I have called attention to the fact that in February 1940 the bankers who sold to the public an issue of $50,000,-000 of Tri-Borough Bridge Authority bonds warned prospective investors that the bankers had been advised by counsel that it was not clear that the interest on the bonds was exempt from federal income tax, and that similar warnings were published in 1939 and 1940 by bankers selling substantial blocks of bonds of other such Authorities.