**PHILADELPHIA NATIONAL BANK and Philadelphia National Corporation, Appellees,**

v.

**UNITED STATES of America, Appellant.**

**No. 81–1331.**

United States Court of Appeals, Third Circuit.

Argued Oct. 14, 1981.

Decided Dec. 11, 1981.

---

John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Gary R. Allen, David I. Pincus (argued), Tax Division Dept. of Justice, Washington, D. C., for appellant; Peter F. Vaira, Jr., U. S. Atty., Philadelphia, Pa., of counsel.

Robert R. Batt, Richard Z. Freemann, Jr. (argued), Bonnie S. Brier, Thomas B. Roberts, Philadelphia, Pa., for appellees; Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., of counsel.

Before HUNTER, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

Interest on money borrowed by political subdivisions is exempt from federal income tax. In this case, the district court concluded that Temple University, a state-related school in Pennsylvania, had sufficient governmental functions and powers to qualify as a political subdivision. Our review of the record, however, persuades us that although the university has close ties with and is dependent upon the state, a delegation of essential governmental power did not take place. Accordingly, we reverse a judgment in favor of the plaintiff bank which had received interest from Temple.

Philadelphia National Bank sued the United States for a refund of taxes paid on interest received from loans to Temple University, contending that under § 103(a)(1) of the Internal Revenue Code, 26 U.S.C. § 103(a)(1) (1976), the university was a "political subdivision." After a bench trial, the district court entered judgment in favor of the bank in the amount of $474,402.

The facts in the case are largely undisputed. Temple University, a private nonprofit corporation in Philadelphia, was founded in 1888 as an educational institution. Under the direction of its Board of Trustees, the school expanded its activities over the years to become a major metropoli-

tan university, but growing financial difficulties required it to consider a change in its structure. Temple's fiscal need coincided with the Commonwealth's desire to meet its constitutional obligation to provide public education by extending opportunities for university training. Recognizing that a formal relationship with the state would be mutually beneficial, the school agreed to reorganization in 1965 pursuant to the Temple University-Commonwealth Act. 24 Pa. Con.Stat.Ann. § 2510–1 *et seq.* (The Commonwealth Act).

One of the major reasons for the legislation was the state's desire to reduce tuition rates by providing financial assistance through annual appropriations. In addition, by statutorily "incorporating" the university into its educational system, the state avoided the much greater cost of establishing and constructing a new public university. Report of Higher Education Committee, House of Representatives, Commonwealth of Pennsylvania, 1965–66 at 39–40.

The stated purpose of the Act is "to extend Commonwealth opportunities for higher education by establishing Temple University as an instrumentality of the Commonwealth to serve as a State-related institution in the Commonwealth system of higher education." *Id.* at § 2510–2. The institution was renamed "Temple University—Of The Commonwealth System of Higher Education" to reflect its new status. *Id.* at § 2510–3. This section provides that, as renamed, Temple "shall continue as a corporation for the same purposes as, and with all rights and privileges heretofore granted to, Temple University, unless hereinafter modified or changed."

As a consequence of the legislation, Temple reconstituted its Board of Trustees to consist of 36 regular members and three ex-officio members, the Governor of Pennsylvania, the Secretary of Education, and the Mayor of Philadelphia. *Id.* at § 2510–4(a). Twelve of the 36 members are designated as Commonwealth Trustees and are appointed by the Governor, President pro tempore of the Pennsylvania Senate, and Speaker of the Pennsylvania House of Representatives. *Id.* at § 2510–4(b).

The state imposes some controls on the university. For example, it is subject to audit of expenditures by the State Auditor General. Moreover, the President of the school must make an annual report to the legislature.

The General Assembly is empowered to set tuition schedules whenever it makes adequate appropriations to the university, but otherwise the management and control of the instructional, administrative, and financial affairs of the university are entrusted to the Board of Trustees.

Temple receives capital improvement benefits comparable to those given land grant colleges and state colleges. For example, the Commonwealth, by agreement with Temple, may "acquire lands, erect and equip buildings, and provide facilities for the use of the university." *Id.* at § 2510–7.

Although it is precluded from pledging the credit of the Commonwealth, "the board of trustees may provide for the issuance of bonds in the name of the university for any proper purpose in the same manner as heretofore." *Id.* at § 2510–9(a). Such obligations, and the income therefrom, are not taxable by the Commonwealth. *Id.* at § 2510–9(c).

After the legislation was enacted, the state's annual appropriation to Temple rose from $20,106,998 in 1966 to $44,568,000 in 1971–72. These amounts represented 50.6% to 62.7% of the unrestricted revenue of the school. During the same period, the General State Authority of Pennsylvania built nine structures for Temple. Land for five of these was acquired in part by condemnation, and in four instances the Authority received the land by conveyance from the university. By 1971, the General State Authority owned 40% of Temple's physical plant. The State does not charge Temple for the use of these facilities nor is there a lease with the school. Property acquired by Temple before 1966 remains in the university's name.

Because the annual Commonwealth appropriations were either inadequate or de-

layed, during the years 1967 through 1971 Temple had to borrow extensively from the plaintiff bank. The proceeds were used to pay operating expenses and to redeem debenture bonds. The interest rate on each loan was set at the regular commercial rate, and was not discounted because of an expected interest exemption from federal income taxes.

After considering the relationship between Temple and the State created by the legislation, the district court concluded that Temple is "a political subdivision in a modern form" and that, as an instrumentality of the state, the university borrows " 'on behalf of' the Commonwealth of Pennsylvania." The court commented that Temple "*exercises* (even if it might not be said to 'possess') every significant sovereign power necessary to effectuate [Pennsylvania's policies for higher education.]" This is so, according to the district court, because Temple has a campus police force and charges tuition for performing a recognized public service, akin to tolls on state-owned turnpikes. In addition, Temple is a beneficiary of eminent domain through its requests to the General State Authority to condemn certain property.[1]

On appeal, the United States argues that Temple is a private, non-profit corporation, governed by a privately controlled Board of Trustees, and has not been delegated sovereign power. The bank contends that Temple is an instrumentality of the state, carries on a public function, possesses police power, and enjoys benefits from the state eminent domain and taxation powers. In addition, the bank asserts that the university issues obligations "on behalf of" the state.

The bank can obtain a § 103 exemption if Temple is deemed to be a political subdivision or if Temple issued the obligations "on behalf of" the state. We will discuss these possibilities separately.

The starting point must be the statute itself. In pertinent part it reads:

"(a). Gross income does not include interest on—(1) the obligations of a State . . . or any political subdivision of any of the foregoing . . . ."

26 U.S.C. § 103(a)(1).

The statute is explained somewhat by a longstanding Treasury Regulation which defines political subdivisions as "any division of any State or local governmental unit which is a municipal corporation or which has been delegated the right to exercise part of the sovereign power of the unit." 29 C.F.R. § 1.103–1(b).

There is surprisingly little decisional law on what constitutes a political subdivision within the meaning of § 103. The Supreme Court has never addressed the issue, and the leading—and almost only—cases on point were decided by the Court of Appeals for the Second Circuit. *Commissioner of Internal Revenue v. Shamberg's Estate*, 144 F.2d 998 (2d Cir. 1944), *cert. denied*, 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631 (1945), and *Commissioner of Internal Revenue v. White's Estate*, 144 F.2d 1019 (2d Cir. 1944), *cert. denied*, 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 632 (1945).

In *Shamberg*, the court held that interest paid on bonds issued by the Port of New York Authority was exempt from federal income tax. The Authority, a body politic and corporate, had been created by a compact between New Jersey and New York,

1. Pennsylvania State University, a land grant school with a closer relationship to the Commonwealth, received Internal Revenue Service private rulings in 1955 and 1957 stating that interest payments on its obligations were exempt. The district court recognized that Temple could not rely on those private letter rulings, *see Weller v. Commissioner*, 270 F.2d 294, 298–99 (3d Cir. 1959), but nonetheless expressed the belief that both schools should be treated alike because similar circumstances were involved.

Even if the private rulings to Penn State University were entitled to some weight, their continued validity is doubtful in light of a more recent published ruling. In Rev.Rul. 77–165, the Commissioner determined that a state university was not a political subdivision within the meaning of § 103. That ruling not only casts doubt on the success of future requests by Penn State, but reveals that the service does not think state universities, much less state-related institutions, should be given political subdivision status for purposes of § 103.

and was governed by a Board of Commissioners, whose members were appointed by the two states.

The Authority was formed to construct and operate toll bridges and tunnels in the New York area, was granted the power of eminent domain and was immunized from suit. It had a police force whose members were designated by statutes of both states as regular police and peace officers. The Authority also had the power to make and enforce regulations governing the operation and maintenance of bridges and tunnels within its control. 144 F.2d at 1002–03.

The court of appeals held that the Authority's activities were "exercised for a public purpose by an agency set up by the states and given many public powers, though not of taxation or control through the suffrages of its citizens. It minimizes its public and political character to treat such an agency as a private corporation merely because of the lack of taxing power which is only one of the attributes of sovereignty." 144 F.2d at 1005. The court quoted approvingly from a 1914 opinion of Attorney General McReynolds that to be denied a political subdivision, a body need not exercise all of the public functions of the state, it being sufficient if the organization had authority to exercise a portion of them.

In *White's Estate*, bonds were issued by the Triborough Bridge Authority, which had been designated by the New York Legislature as a "body corporate and politic constituting a public benefit corporation." Like the Port Authority in *Shamberg*, it was authorized to issue bonds, but not as debts of the city or state. 144 F.2d at 1019–20. After the bonds were fully paid, the bridges which they had financed were to revert to the City of New York.

At the time the Triborough bonds were issued, the Commissioner of Internal Revenue had sent a letter ruling to the Authority stating that "the Authority is in effect an instrumentality of the City of New York, a political subdivision of the State," that the bonds "will be, in effect, bonds of the city issued in the exercise of its borrowing power" and hence exempt under § 103.

*Id.* The court agreed with that assessment, and held that the Authority was "plainly a subdivision of state government empowered to exercise governmental functions on behalf of the City of New York . . ." and that "[t]he Authority is in essence a Department of the city . . . ." *Id.*

There are similarities between the entities discussed in these two cases and Temple University, but there are also significant differences. Unlike Authority Boards whose members are appointed by the government, the majority of the Board that controls Temple is composed of private citizens elected by that very same body. Other divergencies make it apparent that the method utilized by the legislature to establish a state relationship with Temple is unique and the resulting body is not the same as a traditional authority or political subdivision.

The Supreme Court of Pennsylvania discussed Temple's status in *Mooney v. Board of Trustees of Temple University of the Commonwealth System of Higher Education*, 448 Pa. 424, 292 A.2d 395 (1972). In that case the issue was whether the school was a state "agency" and thus subject to the Inspection and Copying Records Act, a state version of the Freedom of Information Act.

The Pennsylvania court noted that "agency" was statutorily defined as "any political subdivision of the Commonwealth . . . or any State or municipal authority or similar organization. . . ." 292 A.2d at 397, *quoting* 65 P.S. § 66.1(1). Emphasizing the Temple legislation statement that the university should continue as a corporation for the same purposes and with all the rights and privileges "heretofore granted," the court said,

We conclude, as did the Commonwealth Court, that this latter declaration reveals an express legislative intent to preserve Temple's status as a non-profit corporation chartered for educational purposes. The receipt by Temple of increased state financial aid no more transforms Temple into a state 'agency' than the receipt of

federal funds can make Temple an agency of the federal government.

*Id.* at 399.

The court observed that the Commonwealth trustees only constituted a one-third minority of the Board, leaving the majority of non-public trustees with the power to manage and control the university. Temple also continued to own the land, buildings, and facilities which it possessed before the Act became effective. Important to the court also was that before the state could expand or alter Temple's facilities, it had to reach an agreement with the trustees. Requiring such approval was thought to be inconsistent with the contention that Temple was a state agency, 292 A.2d at 399, for, as the court reasoned, if Temple were truly a state "agency," the state would wholly control the decisions to be made regarding it.

The provision giving the Auditor General limited responsibility to audit the funds appropriated by the Commonwealth was described by the court as "another indication of the Legislature's intention to preserve Temple's prior status, and not to transform Temple into a state 'agency'." 292 A.2d at 400.

We recognize that, particularly in tax cases, holdings taken from other contexts may be inappropriate. Nevertheless, *Mooney* is an authoritative interpretation of the pertinent state statute and must be carefully considered.

On the other hand, such cases as *Henderson v. Fisher*, 631 F.2d 1115 (3d Cir. 1980); *Braden v. University of Pittsburgh*, 552 F.2d 948 (3d Cir. 1977); and *Isaacs v. Board of Trustees of Temple University-of the Commonwealth System of Higher Education*, 385 F.Supp. 473 (E.D.Pa.1974), which explore whether activities of state-related universities are "state action" within the ambit of 42 U.S.C. § 1983, are of little assistance here. In those cases, the issue was whether a sufficient symbiotic relationship existed between the school and the Commonwealth so that there was liability for civil rights violations.

A finding of joint activity that may constitute state action does not, however, make a private party a state "agency" or political subdivision. This is clearly demonstrated by *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), where the actions of a privately owned restaurant were found to be "state action" because of its close ties with a parking authority which was a state agency. *Id.* at 724–25, 81 S.Ct. at 861–62. The finding of state action by the restaurant did not transform that private enterprise into a governmental body. Similarly, the holding in *Isaacs v. Temple* that there was state action does not establish that the University is a political subdivision, nor did the court purport to address that issue.

Equivalent considerations are applicable to litigation that Temple had before the National Labor Relations Board. That an entity may have some governmental characteristics for certain purposes does not necessarily control its status under a different statutory scheme. *See, e. g., Truman Medical Center, Inc. v. NLRB*, 641 F.2d 570, 572–73 (8th Cir. 1981). Thus the fact that the NLRB declined to exercise jurisdiction over a labor matter at Temple because of its unique relationship with the state is not determinative. *See Temple University-of the Commonwealth System of Higher Education*, 194 NLRB 1160 (1972).

Since we must resolve the question in the context of the Internal Revenue Code itself, we turn to the delegation of state sovereignty test mentioned in the Treasury Regulation and discussed in *Shamberg* and *White*. The three sovereign attributes discussed are the power to tax, the power of eminent domain, and the police power.

Neither in *White* nor *Shamberg* or in the case at hand was the power of taxation conferred by the state. The bank contends that since the university benefits from the State's power to tax through legislative appropriation of funds, there is to some extent a delegation of the tax power. We do not find that argument convincing. Every contractor who deals with the state receives similar benefits, but those private individu-

als cannot levy taxes to collect the sums owed them by the state, and neither can Temple.[2]

In *Shamberg* and *White*, each Authority was granted the power of eminent domain. No such authorization was extended to Temple. When it wishes to erect additional facilities, the university must request the General State Authority to procure the property. The power to condemn selected property is vested in the Authority, and the fact that it has cooperated with the university by accepting and implementing its suggestions does not constitute a grant of sovereign power to Temple.

It is clear that the General State Authority could decline to acquire any given site. The fact that the state retains title to the land (and buildings) obtained by eminent domain further demonstrates that Temple does not possess the power of condemnation, even though incidentally benefiting by the state's exercise of its prerogative.

■ The third indicia of sovereignty, the police power, is not established here by the existence of a campus police force. As the Court said in *Chicago, Burlington & Quincy Railway Co. v. Illinois, ex rel. Drainage Commissioners*, 200 U.S. 561, 592, 26 S.Ct. 341, 349, 50 L.Ed. 596 (1906), "the police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety." In the context of governmental authority, therefore, the "police power" is much more than the power to maintain a corps of police officers. The Supreme Court succinctly defined this attribute of sovereignty by saying that "In a sense, the police power is but another name for the power of government . . . ." *Mutual Loan Co. v. Martell*, 222 U.S. 225, 233, 32 S.Ct. 74, 75, 56 L.Ed. 175 (1911).

The maintenance of a campus police force, even with the limited power of arrest granted by a separate state statute, 71 Pa. Cons.Stat.Ann. § 646 (Purdon Supp.1971), not only applies to state-related institutions like Temple but to "state-aided" schools as well. To say the least, it is highly unlikely that Pennsylvania intended to confer its police power on colleges less closely related to it than Temple. Moreover, the campus police are authorized to enforce laws enacted by the state, not by the university, and charges must be brought before state judicial officers, not school authorities. Nor can it be said that because Temple creates and enforces rules of conduct and instructional policies, its authority is analogous to the "power of government." Those who enter upon Temple's premises as students, faculty or otherwise, do so voluntarily and accept the necessary regulation that accompanies such an undertaking.

In the *Shamberg* case, by contrast, the Authority was given the power to enact rules and regulations effective as to the general public and enforceable through the criminal courts. In addition, New York enacted legislation giving the Authority the power of subpoena and the power to enforce its orders in the civil courts. 144 F.2d at 1002–03. In short, the Authority in *Shamberg* had been delegated substantial portions of the state police power to insure the proper operation and control of the bridges and tunnels within its jurisdiction.

At most, the university has been given a limited authorization to exercise one small aspect of police power—one that has been delegated to private organizations as well. With such a minimal grant of police power, and with no eminent domain or taxing power, Temple cannot be said to be a political subdivision.

---

**2.** The Revenue Rulings are not particularly helpful with respect to evaluating the delegation of the power to tax as an aspect of sovereignty. For example, in Rev.Rul. 77–164, even though a community development authority was given the authority to impose and collect fees for capital improvements, this was not found to be taxing power. In contrast, Rev. Rul. 73–563, a state rapid transit authority received benefits because local governmental bodies exercise the tax power on its behalf. In that instance, the indirect method of taxation was nevertheless said to be sufficient to constitute a delegation of the power to tax.

Accepting *arguendo* that Temple's work of providing higher education is the performance of a governmental, public function,[3] it must be noted that the Commonwealth meets but part of the demand, for the state-related institutions are far outnumbered by private colleges and universities. *See Old Colony Trust Co. v. United States,* 438 F.2d 684, 687 (1st Cir. 1971). Here again, Temple is quite different from the entities in *Shamberg* and *White,* which bore the responsibility for construction and maintenance of bridges and tunnels, functions which in modern society are practically always assumed by governmental bodies.

As an alternative ground, the Bank contends that because the proceeds of the loan to Temple were used to defray expenses which would otherwise have been met by legislative appropriations, the school acted "on behalf of" the state. This argument is not persuasive either.

In *Shamberg,* the court concluded that the words "on behalf of" meant bonds issued by a state authority to carry out a public purpose where the latter is not named as an obligor. 144 F.2d at 1006. In that case, however, once having found that the Port Authority was a political subdivision, the court has no need to explore to any extent the application of the "on behalf of" clause.

In *White's Estate,* the court referred to the Authority as the "alter ego" of the city, especially noting that on redemption of the obligations, title to the bridge would revert to the City of New York. In view of this, "[t]o distinguish between such an agency and the city in regard to the [tax] exemption seems to us purely technical." 144 F.2d at 1021.

Again, the distinctions between the *Shamberg-White* situations and Temple's are illuminating. In the former, the obligations were to defer, in the main, the cost of capital improvements which would either go to a governmental unit or would be available to the public for governmental purposes. Had the Authorities not paid for the projects, the state or city would have been required to do so.

Here, on the other hand, the loans were used for current operating expenses, not capital projects. The state was not the sole source of revenue, because much of the school's operating expenses came from its own resources, such as tuition and other private means. In the years when the university received less than its requested appropriation, it had to secure additional funds from other available sources—just as it did in the era before the Commonwealth Act became effective.

In the years when the appropriations were late, the university had to borrow. Although legislative delays caused unnecessary hardship to the university, there was no legal obligation on the Commonwealth to appropriate any particular sum in a given year. The Act itself permits Temple to set fee schedules when insufficient appropriations are made. Thus, when state funds were not forthcoming, Temple was thrown back upon its own resources like other private institutions. The interest on money borrowed because of the legislature's delay was simply another operating expense, which reduced the funds available for educational purposes. It was unfortunate for the school and should not have happened, but even so, Temple acted only on its own behalf, not that of the state.

The Treasury regulation explains that obligations issued "on behalf of" a state or a local governmental unit "by constituted authorities empowered to issue such obligations are the obligations of such a unit." 26 C.F.R. § 1.103–1(b). Many states and municipalities have established authorities to construct and maintain governmental facilities when debt limits imposed by state constitutions or statutes would not permit fi-

---

**3.** The Tax Court, in The Seagrave Corp., 38 T.C. 247 (1962), found that volunteer fire companies were not subdivisions of the state even though they perform a "public function." Public service was insufficient to transform an oth-erwise private corporation into an arm of the state when "[t]hey were not created by any special statutes and they received no delegation of any part of the State's power." *Id.* at 250. *See also* Rev.Rul. 77–232.

nancing by the governmental unit itself. *See, e.g.,* 53 Pa.Stat.Ann. § 306(A) (Purdon Supp.1981) (Pennsylvania Municipal Authorities Act). In that situation, the duly "constituted authority" is a wholly governmentally controlled entity, performing a wholly governmental function, and it is created to be in effect the alter ego of the governmental unit. Under the regulations, bonds issued by the Authority would be considered issued on behalf of the state.

No such identity of interest, control, or intent, however, exists between Temple and the Commonwealth of Pennsylvania. Nor is there any language in the Commonwealth Act that purports to make Temple the alter ego of the state. The wording of the statute itself and the opinion of the Pennsylvania Supreme Court in *Mooney* make that apparent. We cannot say, therefore, that Temple issued its obligation "on behalf of" the Commonwealth of Pennsylvania.

Section 103 has been amended by Congress in recent years to include specifically bonds for industrial development, and obligations issued for construction of such diverse structures as residential units, sports arenas, convention halls, waste disposal plants, air or water pollution control facilities, and other similar projects. The fact that Congress has "fine-tuned" the tax exemption section by defining the status of many different types of bonds suggests that a liberal definition of "political subdivision" is not warranted here.

Whether to grant or withhold an exemption for the obligations of various kinds of entities has become a matter for Congress to decide on a policy basis, rather than on the concerns expressed in 1913 that a federal tax on state obligations would be unconstitutional. *Cf. Commissioner v. Shamberg's Estate,* 144 F.2d at 1004. If the interest on obligations of state-related schools is to be exempt from federal tax, that decision should be made by Congress, not by this court via a strained construction of the statute.

In summary, we conclude that Temple was neither a "political subdivision" of the state, nor an entity constituted to issue bonds "on behalf of" the State of Pennsylvania. Accordingly, the interest paid on the school's obligation was not tax exempt, and the judgment in favor of the bank will be vacated. The case will be remanded to the district court with instructions to enter judgment in favor of the United States.