United States Court of Appeals,

Fifth Circuit.

No. 91–4474.

TEXAS LEARNING TECHNOLOGY GROUP, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

April 16, 1992.

Appeal from a Decision of the United States Tax Court.

Before THORNBERRY, KING, and DEMOSS, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from the Tax Court's decision in a declaratory judgment action. The Appellant filed a suit for declaratory judgment in the Tax Court after the Commissioner of the Internal Revenue Service ruled that the Appellant is not a "political subdivision" under § 170(b)(1)(A)(v) of the Internal Revenue Code. The Tax Court agreed with the Commissioner that Appellant is not a "political subdivision." The Appellant now appeals the Tax Court's decision.

I. Background

A. The Proceedings Below

After the Commissioner of the Internal Revenue Service ruled that the Appellant, Texas Learning Technology Group (TLTG), did not qualify as a political subdivision under § 170(b)(1)(A)(v), TLTG filed a suit for declaratory judgment in the Tax Court, requesting a ruling that it qualifies as a "political subdivision" and is thus excepted from "private foundation" status and its requirements. The case went before the Tax Court without a trial pursuant to Tax Ct.R. 122, based upon the pleadings, the administrative record, and a partial stipulation of facts filed by the parties. The Tax Court found that TLTG failed to qualify for an exemption from "private foundation" status as a "political subdivision" under § 170(b)(1)(A)(v) because it was not authorized to exercise

"sovereign power."[1]  TLTG now appeals the Tax Court's ruling.

B. Texas Learning and Technology Group

TLTG is an unincorporated association that was created by an interlocal agreement among eleven Texas public school districts.  The eleven school districts entered into the agreement pursuant to the Interlocal Cooperation Act, Tex.Rev.Stat.Ann. art. 4413(32c) (Vernon 1976).  The Interlocal Cooperation Act allows any local government to "contract or agree with one or more local governments to perform governmental functions and services under the terms of [the] Act." Tex.Rev.Stat.Ann. art. 4413(32c)(4)(a).  Hence, the school districts, as local governments, formed a contract creating TLTG in order to fund, organize, and manage projects designed to improve the public education curriculum in Texas.

TLTG is governed by a board of directors that is responsible for TLTG's fiscal and administrative policies.  The board of directors consists of fifteen members:  five board members are appointed by the President of the Texas Association of School Administrators;  five board members are appointed by the President of the Texas Association of School Boards;  two members are appointed by the Texas Board of Education;  and the Governor, Lieutenant Governor, and Speaker of the House of Representatives of Texas each appoint one member.

TLTG entered into a contract with the National Science Center for Communications and Electronics Foundation to develop a physical science curriculum.  TLTG plans to sell its physical science curriculum to all public school districts in Texas.  The revenues first will be used to pay for development costs, and any remaining funds will be returned to the member school districts, up to

---

[1]The IRS originally stated that TLTG could avoid "private foundation" status by meeting the "public support" test under § 170(b)(1)(A)(vi), for charities that receive most of their funding from governmental units.  (TLTG receives almost all of its funding from the school districts which are governmental units.)  TLTG wants to escape "private foundation" status only by means of subsection (v) and not subsection (vi), because under subsection (vi), TLTG's finances would be examined periodically to determine whether it continued to satisfy the "public support" test.

125% of the participating member school district's contributions. Any revenues not returned to participating member school districts may be used by TLTG for any purpose consistent with its agreements with its members. In the future, TLTG will fund, organize, and manage new projects that are consistent with its purposes and objectives. Each member school district will have an option to participate in projects by entering into separate interlocal project agreements. Each member public school district must pay $500 in annual dues to TLTG and contribute funds for any group project in which it participates. Also, the school districts are required to fund any deficit that TLTG might incur.

The parties have stipulated that TLTG does not maintain the power to tax, the power of eminent domain, or the power to issue government bonds.

C. Relevant Provisions of the Internal Revenue Code

TLTG's tax exempt status is not at issue in this appeal. TLTG challenges only the Tax Court's conclusion that TLTG is not a political subdivision within the meaning of § 170(b)(1)(A)(v).

TLTG is a § 501(c)(3) organization and any § 501(c)(3) organization is presumed to be a "private foundation" unless it qualifies under one of the exceptions to "private foundation" status listed in § 509(a). As long as an organization is classified as a "private foundation," it is subject to certain excise taxes for self-dealing, speculative investing, lobbying, and other restricted activities. *See* 26 U.S.C. §§ 4940–4945 (1989). Tax exempt organizations that are classified as "other than private foundations" are not subject to the requirements of §§ 4940–4945.

Under § 509(a)(1), an organization described in § 170(b)(1)(A)(i)–(vi) is excepted from private foundation status. Subsection (v), the subsection TLTG seeks to avail itself of, requires by way of § 170(c)(1) that TLTG be "a state, a possession of the United States, or any political subdivision of any of the foregoing...." Thus, to escape private foundation status by way of

subsection (v), TLTG must be a "political subdivision" of the state of Texas.

## II. Analysis

### A. The Standard of Review

"The scope of review by the Courts of Appeal of Tax Court decisions and nonjury District Court decisions is the same." JOHN C. CHOMMIE, FEDERAL INCOME TAXATION, § 301 (1973); 26 U.S.C. § 7482 (1989). The Tax Court's ruling that TLTG is not a "political subdivision" is a conclusion of law which we review *de novo.*

### B. The Definition of "Political Subdivision"

The term "political subdivision" is not defined in § 170 or in the Treasury Regulations accompanying § 170. Treasury Regulation 1.103–1(b), however, provides that any division of the government that is a municipal corporation or has been delegated the right to exercise part of the sovereign power of the government, is a political subdivision. 26 C.F.R. § 1.103–1(b). Case law both before and after the promulgation of Regulation 1.103–1(b) has required an entity to be authorized to exercise some sovereign powers in order to be considered a political subdivision. The power to tax, the power of eminent domain, and the police power are the generally acknowledged sovereign powers. 1 MERTENS, LAW OF FEDERAL INCOME TAXATION, § 8.09 at 27. As discussed below, all of the cases addressing the meaning of the term "political subdivision" under the Internal Revenue Code have required the entity to possess at least one of the three generally recognized sovereign powers in order to be classified as a "political subdivision."

In a 1914 Opinion, the Attorney General of the United States recognized that in order to create a political subdivision, a state must delegate some of its sovereign powers to the entity. *See* 30 Op.Atty.Gen. 252 ("It is not necessary that [the division] ... exercise all the functions of the state ..., it is sufficient if it be authorized to exercise a portion of them."). The Attorney General found that the special assessment districts at issue were political subdivisions because they had been created for

the purpose of carrying out state functions and had been given the "power of taxation—perhaps the most important power possessed by the State." *Id.*

In *Commissioner of Internal Revenue v. Shamberg's Estate,* 144 F.2d 998 (2nd Cir.1944), *cert. denied* 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631 (1945), the Second Circuit addressed whether interest on the New York Port Authority's bonds was excludable from gross income under § 22(b)(4) of the Revenue Acts of 1936 and 1938. The court found that the New York Port Authority was a political subdivision of New York and New Jersey because it was created by a contract between the two states and maintained many sovereign powers including the power of eminent domain and police power (the police power consisted of the power to subpoena, the power to issue orders and enforce orders against persons within its jurisdiction, and the power to maintain a uniformed police force). The only one of the three generally recognized sovereign powers that the New York Port Authority did not maintain was the power to tax. In response to the argument that the Authority was not a political subdivision because it was not authorized to tax citizens the court wrote:

> [h]ere the activities, ... are exercised for a public purpose by an agency set up by the states and given many public powers, though not of taxation or control through the suffrages of citizens. It minimizes its public and political character to treat such an agency as a private corporation merely because of the lack of taxing power which is only one of the attributes of sovereignty.

*Shamberg,* 144 F.2d at 1005. The *Shamberg* case does not impose a rigid test for political subdivision status, but it does require that an entity be authorized to exercise some sovereign power, recognizing as the most important of these powers, the power to tax, the power of eminent domain, and the police power.

In *Commissioner of Internal Revenue v. White's Estate,* 144 F.2d 1019 (2d Cir.1944), *cert. denied,* 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 632 (1945), the Second Circuit considered whether the Triborough Bridge Authority (Authority) was a political subdivision in order for the interest on its bonds to be tax-exempt. The court found that the Authority was a political subdivision of the State

of New York because the Authority was "plainly a subdivision of state government empowered to exercise governmental functions on behalf of the City of New York...."  *White,* 144 F.2d at 1020. The Authority maintained the power of eminent domain, and the power "to make use of city agents, employees, and facilities, and to issue bonds for constructing the bridges." *Id.*

In *The Seagrave Corp. v. Commissioner of Internal Revenue,* 38 T.C. 247 (1962), the Tax Court explicitly recognized that an entity must be authorized to exercise a sovereign power in order to constitute a political subdivision.  In *Seagrave,* the issue was whether volunteer fire departments were political subdivisions under § 103 of the Internal Revenue Code.  The Tax Court held that

> the volunteer fire departments perform a public function in the sense that they perform the same function that is generally carried on by municipal fire departments.  But the volunteer fire companies here involved are not created by any special statutes and they received no delegation of any part of the State's power.  It is not enough that they perform a public service.  They cannot be called a subdivision of the state unless there has been a delegation to them of some functions of local government.

*Seagrave,* 38 T.C. 247 (1962).  According to *Seagrave* and several later opinions, the delegation of traditional sovereign authority is the crucial factor in determining whether an organization is a political subdivision.  *See Philadelphia Nt'l. Bank v. United States,* 666 F.2d 834, 839 (3rd Cir.1981) (holding that Temple University was not a political subdivision because sovereign power had not been delegated), *cert. denied,* 457 U.S. 1105, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982); *Old Colony Trust Co. v. United States,* 438 F.2d 684 (1st Cir.1971) (holding that a hospital was not a political subdivision in part because it did not exercise any sovereign powers).

C. Applying the Definition of "Political Subdivision" to TLTG

TLTG argues that the cases discussed above should not be read to create a strict legal formula for determining whether an entity is a political subdivision.  We agree that the case law may not have enumerated an exhaustive list of sovereign powers, but we do read the cases to require either the delegation of one or more of the three traditional sovereign powers discussed in *Shamberg,* or some other recognized sovereign power.  We find that TLTG does not maintain any of the

sovereign powers discussed in *Shamberg,* nor any other recognized sovereign power.

TLTG concedes that it does not possess the power of eminent domain, the power to levy or collect taxes, or the power to issue government bonds. (Appellant's Br. at 11). TLTG argues, however, that its power to establish, regulate, and distribute curricula to the school districts constitutes sovereign police power. (Appellant's Br. at 24). The limited authority that TLTG is authorized to exercise regarding the content of public school curriculum, does not constitute police power. *See Philadelphia Nt'l Bank v. United States,* 666 F.2d 834 (3rd Cir.1981), *cert. denied,* 457 U.S. 1105, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982).

TLTG also contends that, although it does not possess the power to tax, its power to collect funds from its member school districts for membership dues and operating deficits constitutes a sovereign assessment power. TLTG intimates that while this power is not equivalent to the power to tax, it is a recognized sovereign power. As support for this theory, TLTG cites the 1914 Attorney General Opinion discussed above. TLTG contends that the assessment power of the irrigation districts at issue in the 1914 Attorney General Opinion was different from a taxing power, but yet was recognized as a sovereign power by the Attorney General. (Appellant's Reply Br. at 10). We disagree. The Attorney General considered the assessment powers of the irrigation district to be the equivalent of taxing powers. 30 Op.Atty.Gen. 252 ("As indicated by the term "special assessment districts,' these divisions are given the power of taxation—perhaps the most important power possessed by the State."). We reject TLTG's argument that the Attorney General did not consider a delegation of taxing power critical to its finding that the irrigation district was a political subdivision. Furthermore, we do not find merit in TLTG's assertion that its power to collect funding from its members constitutes a sovereign power.

We agree with the Commissioner and the Tax Court that TLTG has not been delegated any sovereign powers. Without the authority to exercise sovereign power, TLTG cannot constitute a

political subdivision.  *See* 26 C.F.R. § 1.103–1(b).

D. TLTG's "Integral Part" Argument

TLTG argues alternatively that it should be classified as a political subdivision because it is an "integral part" of its member school districts, which, as the Government concedes, are political subdivisions.  TLTG cites several cases in which courts have held that a division of a larger entity was entitled to share the tax-exempt status of the larger entity because the division was an "integral part" of the larger entity.  It is true that an "integral part" of a larger entity is entitled to share in the larger entity's tax-exempt status.  *See, Hospital Bureau of Standards and Supplies v. United States,* 158 F.Supp. 560, 141 Ct.Cl. 91 (1958); *Estate of Philip R. Thayer v. Commissioner,* 24 T.C. 384 (1955); *Squire v. Students Book Corp.,* 191 F.2d 1018 (9th Cir.1951).  It is not true, however, that TLTG is an integral part of a political subdivision.  The most that can be said for TLTG in this connection is that it may be integrally related to several political subdivisions.  Such a relationship does not automatically entitle the integrally related entity to be classified as a political subdivision.

The courts have consistently recognized that political subdivision status requires a delegation of sovereign authority.  *See, Shamberg,* 144 F.2d 998;  *White,* 144 F.2d 1019;  *Seagrave,* 38 T.C. 237.  To apply the "integral part" cases in this context would completely circumvent the requirement of sovereign authority for political subdivision status.  To bestow political subdivision status on an entity, merely because it is an integral part of a political subdivision, would bypass the requirement that a political subdivision must be authorized to exercise some sovereign power.  We refuse to throw out the sovereign power requirement for political subdivision status.  Therefore, we find the "integral part" cases inapplicable to a determination of political subdivision status.

III. Conclusion

We find that a political subdivision, within the meaning of § 170(b)(1)(A)(v), must possess recognized sovereign power.  TLTG does not maintain any recognized sovereign powers and

therefore is not a political subdivision within the meaning of subsection (v).  For this reason, we

AFFIRM the opinion of the Tax Court.